Anna HAUPTMANN, Plaintiff,

v.

David T. WILENTZ, et al., Defendants.

Civ. No. 81–3177.

United States District Court,
D. New Jersey.

Aug. 11, 1983.

354

Robert R. Bryan, Trudy Maran, Newark, N.J., for plaintiff.

Irwin Kimmelman, Atty. Gen., State of N.J., by Eugene J. Sullivan, Asst. Atty. Gen., Trenton, N.J., William B. McGuire, Lum, Biunno & Tompkins, Newark, N.J., Ronald S. Diana, New York City, for defendants.

Gordon Deiger, Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for U.S. Dept. of Justice.

OPINION

LACEY, District Judge.

Before the court are the motions of defendants David T. Wilentz, the State of

New Jersey, the Hearst Corporation, Lewis J. Bornmann, John B. Wallace, William F. Horn, Joseph A. Wolf, Clinton L. Pagano, Brendan T. Byrne, James R. Zazzali, Hugo Stockburger, and Thomas H. Sisk to dismiss the complaint for failure to state a claim upon which relief can be granted.[1]

## INTRODUCTION

This case arises out of the prosecution and execution of Bruno Richard Hauptmann for the murder of Charles A. Lindbergh, Jr., over four decades ago. Charles A. Lindbergh, Jr., the twenty-month-old son of the famous aviator Charles Lindbergh and his wife, the writer Anne Morrow Lindbergh, was kidnapped from his home near Hopewell, New Jersey, on the night of March 1, 1932. Charles Lindbergh paid a $50,000 ransom on April 2, 1932; however, the child was not returned. On May 12, 1932, the remains of a child, later identified as those of Charles A. Lindbergh, Jr., were found in a shallow grave about five miles from Hopewell. Over two years later, on September 19, 1934, Hauptmann was arrested in New York after passing one of the bills included in the ransom payment. He was interrogated in New York and was extradited to New Jersey on October 19, 1934. He was incarcerated in Flemington, Hunterdon County, New Jersey.

Defendant David T. Wilentz served as Attorney General for the State of New Jersey during Hauptmann's trial and during all post-trial proceedings. He was responsible for prosecuting the State's case against Hauptmann. The trial began in Flemington on January 2, 1935, and continued for six weeks. Justice Thomas W. Trenchard presided over the trial, at which Hauptmann was represented by counsel.

On February 13, 1935, the jury returned its verdict, finding Hauptmann guilty of first degree murder. The jury made no recommendation for a life sentence. This left available to the court the option of ordering execution.

Hauptmann appealed his conviction to the New Jersey Court of Errors and Appeals, which affirmed. *State v. Hauptmann,* 115 N.J.L. 412, 18 A. 809 (E. & A. 1935). His petition to the United States Supreme Court for certiorari was denied. *Hauptmann v. New Jersey,* 296 U.S. 649, 56 S.Ct. 310, 80 L.Ed. 461 (1935).

According to the State, Hauptmann petitioned the United States Circuit Court in Trenton for a writ of habeas corpus on January 13, 1936, and his petition was denied on January 14, 1936, but the records of that proceeding are not available. Plaintiff does not dispute these assertions. Hauptmann also petitioned the Supreme Court for a writ of habeas corpus, but this too was denied. *Ex parte Hauptmann,* 297 U.S. 693, 56 S.Ct. 385, 80 L.Ed. 985 (1936). He filed two petitions for clemency with the New Jersey Court of Pardons; these were rejected as well. After several postponements, Hauptmann was executed in the electric chair at Trenton State Prison on April 3, 1936.

Plaintiff Anna Hauptmann, the widow of Richard Hauptmann, instituted this action on October 14, 1981. She subsequently filed an amended complaint on November 23, 1981, a second amended complaint on February 25, 1982, a third amended complaint on January 19, 1983, and a fourth amended complaint on March 7, 1983.[2] Plaintiff seeks relief for alleged violations of both her own and her late husband's civil rights, pursuant to 42 U.S.C. §§ 1983, 1985 and

---

1. As will be discussed in Section VII, *infra,* New Jersey Governor Thomas Kean and Attorney General Irwin Kimmelman are substituted defendants. *See* Fed.R.Civ.P. 25(d)(1).

 Defendants also move, in the alternative, for summary judgment. In view of the court's disposition of the case, it is unnecessary to reach this alternative motion.

2. The Fourth Amended Complaint contains little new material. By order dated March 14,

1983, this court provided that the original complaint and all succeeding amended complaints previously filed with the court would be deemed part of the Fourth Amended Complaint, that all motions previously filed by defendants (including the instant motions) would not have to be refiled, and that said motions would be deemed to apply to the Fourth Amended Complaint.

1986; she also asserts pendent state law claims. Although the complaint, in its various versions, is lengthy and diffuse, its gist is that Hauptmann was denied a fair trial and suffered violations of his first, fourth, fifth, sixth, eighth and fourteenth amendment rights.

### I. Claims Against Former Attorney General Wilentz

Plaintiff has sued former Attorney General Wilentz "individually, in his official capacity, in his investigative capacity, and in his continuing capacity as a Member of the New Jersey State Bar." Amended Complaint ¶ 6.[3] The claims against Wilentz will be discussed in more detail below. Briefly, however, plaintiff alleges that Wilentz knowingly presented perjured, false, and misleading testimony at trial; that he deliberately withheld exculpatory evidence; that he conspired with defendant Hearst

Corporation (Hearst) to deprive Hauptmann of his right to a fair trial; and that he conspired with State Police officers who carried out illegal searches and seizures, contaminated the jury, and deprived Hauptmann of his right to privacy and his right to counsel. Plaintiff seeks declaratory judgment, compensatory and punitive damages, costs, and attorneys' fees.

 Defendant Wilentz argues that the court should dismiss the complaint against him, pursuant to Fed.R.Civ.P. 12(b)(6), because all of the claims against him fall within the zone of absolute immunity afforded to prosecutors by *Imbler v. Patchman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).[4] In addition, Wilentz argues that the claims are barred by the statute of limitations[5] and that some of the plaintiff's allegations fail to state claims under 42 U.S.C. § 1983.[6] Plaintiff argues

---

**3.** The Second, Third, and Fourth Amended Complaints each reallege and incorporate by reference all of the allegations in the preceding version(s) of the complaint. For convenience, citations will refer to the most recent version of the complaint which sets out a given allegation in full.

**4.** Although Wilentz has not yet filed an answer, Fed.R.Civ.P. 12(b) permits affirmative defenses, such as absolute immunity or statute of limitations, to be raised by motion to dismiss. *Connelly Found. v. School Dist. of Haverford Twp.*, 461 F.2d 495, 496 (3d Cir.1972) (per curiam); *Williams v. Murdoch*, 330 F.2d 745, 749 (3d Cir.1964); 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 8.28 at 8–270 (2d ed. 1983). The affirmative defense raised by motion to dismiss may be handled under Rule 12(b), without resort to summary judgment procedure, if the defense appears on the face of the complaint. *Iacaponi v. New Amsterdam Casualty Co.*, 379 F.2d 311 (3d Cir.1967) (per curiam), *cert. denied*, 389 U.S. 1054, 88 S.Ct. 802, 19 L.Ed.2d 849 (1968); 2A J. Moore & J. Lucas, *supra*, ¶ 8.28 at 8–272 & n. 7.

In this case, the fact that Wilentz prosecuted Hauptmann clearly appears on the face of the complaint. *See, e.g.,* Amended Complaint ¶¶ 6, 21, 26–27, 29, 31–33; Second Amended Complaint ¶¶ 33–2 and 33–3 (both of which refer to "the prosecutor Wilentz"), 33–6; Third Amended Complaint ¶ 33–10. Thus his immunity defense may be handled by a motion to dismiss.

**5.** The affirmative defense of statute of limitations may be raised by motion to dismiss, and may be handled without resort to summary

judgment procedure if it appears on the face of the complaint, *supra* n. 4. Here, the dates of Hauptmann's arrest, pre-trial incarceration, trial, conviction, and execution appear on the face of the complaint. *See, e.g.,* Amended Complaint ¶¶ 5–6, 18, 20; Third Amended Complaint ¶ 33–12. Other relevant dates, such as the date the state police allegedly seized personal property belonging to the Hauptmanns, also appear. *See* Amended Complaint ¶ 28.

**6.** Plaintiff, in her complaint, states that she is suing under 42 U.S.C. §§ 1983, 1985(3), and 1986, but often fails to separate her claims under those statutes. *See, e.g.,* Amended Complaint ¶ 34. Section 1983 provides a damages remedy against any person who, under color of state law, deprives another of any rights, privileges, or immunities secured by the federal constitution or laws. Section 1985(3) provides a damages remedy against any person who conspires "for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...." 42 U.S.C. § 1985(3). This section reaches certain private conspiracies. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). *But see United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott*, —— U.S. ——, ——, 103 S.Ct. 3352, 3357, 77 L.Ed.2d 1049 (1983). Section 1986 is a companion to § 1985, providing a remedy for misprison of a § 1985(3) conspiracy. Wilentz does not dispute that he was acting under color of state law when he prosecuted Hauptmann. Any violation of §§ 1985(3) or 1986 by a state actor

that Wilentz is entitled only to qualified immunity because his actions exceeded the traditional prosecutorial function of initiating and presenting the state's case; under the standard set out in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L. Ed.2d 396 (1982), she contends, Wilentz is not immune. She also asserts that her claims are not time-barred, and are cognizable under § 1983.[7]

For convenience, the court will divide plaintiff's claims against Wilentz into four categories: claims based on concealment of exculpatory evidence and presentation of perjured, false and/or misleading testimony at trial; claims based on authorization of illegal investigative techniques; all other claims, with the exception of a due process claim based on the theory that the entire prosecutorial process was a mockery of justice; and the due process claim.

■ A complaint may be dismissed under Fed.R.Civ.P. 12(b)(6) when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *accord Paolino v. Channel Home Centers,* 668 F.2d 721, 722 (3d Cir.1981). On a Rule 12(b)(6) motion, the district court is to limit its consideration to the facts alleged in the complaint. *Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. at 102; *Biesenbach v. Guenther,* 588 F.2d 400, 401 (3d Cir.1978). All the well pleaded material factual allegations of the complaint are to be taken as true, and the complaint is to be read in the light most favorable to plaintiff. *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *Paolino, supra,* 668 F.2d at 722.

## A. Claims Based on Concealment of Exculpatory Evidence and Presentation of Perjured, False and/or Misleading Testimony

■ The starting point for any discussion of prosecutorial immunity is *Imbler v. Pachtman, supra.* The plaintiff in *Imbler* had been convicted of murder after a jury trial. He brought suit under § 1983 against the prosecutor who had presented the State's case against him, alleging that the prosecutor had knowingly used false testimony at trial and had concealed exculpatory evidence. The Supreme Court held that a prosecutor is absolutely immune from § 1983 suits for damages on claims arising out of his initiation of a prosecution and his presentation of the State's case at trial. *Id.* 424 U.S. at 431, 96 S.Ct. at 995.[8]

---

necessarily violates § 1983; § 1983 may be said to subsume §§ 1985(3) and 1986, when the defendant is a state actor. In any case, plaintiff fails to allege the discriminatory animus required for § 1985(3) claims. *See infra,* pp. 386–387. The parties have focused on plaintiff's claims against Wilentz under § 1983; for the reasons stated, the court will do the same.

7. All of plaintiff's claims against Wilentz, with the exception of the claim that Wilentz withheld plaintiff's personal property, are based on alleged violations of her deceased husband's civil rights. Generally, one may not sue for the violation of another's civil rights. *McGowan v. Maryland,* 366 U.S. 420, 429, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393 (1961); *O'Malley v. Brierley,* 477 F.2d 785 (3d Cir.1973); *Safeguard Mut. Ins. Co. v. Miller,* 477 F.Supp. 299, 306 (E.D.Pa. 1979). A cause of action under the Civil Rights Act survives the complainant's death, however, if the cause of action would survive under the appropriate state law. *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554

(1978); *Guyton v. Phillips,* 606 F.2d 248 (9th Cir.1979); *Brazier v. Cherry,* 293 F.2d 401, 404 (5th Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *Baffa v. Black,* 481 F.Supp. 1083, 1085 (E.D.Pa.1979). Defendant Wilentz does not argue that the causes of action here asserted would not survive under New Jersey law.

The state defendants, in their initial Brief in Support of Motion to Dismiss Amended Complaint at 32, state that plaintiff must establish that she is an administratrix ad prosequendam in order to assert her husband's claims. Plaintiff states that she has now procured the necessary letters of administration ad prosequendam, Plaintiff's Supplemental Memorandum in Opposition to Motions to Dismiss at 79, and the state defendants have not contested the issue.

8. *See also Briscoe v. LaHue,* —— U.S. ——, 103 S.Ct. 1108, 1115, 75 L.Ed.2d 96 (1983) (reiterating, in dealing with witness immunity, the *Imbler* holding); *Butz v. Economou,* 438 U.S. 478, 508–16, 98 S.Ct. 2894, 2911–15, 57 L.Ed.2d 895 (1978) (administrative agency officials perform-

The court reasoned that, although § 1983 provides a cause of action against "[e]very person" who acts under color of state law to deprive another of a constitutional right, prosecutors have always been immune from suit at common law, and the policies underlying common law prosecutorial immunity apply with equal force to § 1983 actions. The Court found absolute immunity necessary because, if the prosecutor received only qualified immunity, he would be constrained in the performance of his duties, and his time and energy would be diverted from criminal prosecutions to the defense of civil suits which "could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Id.* at 425–26, 96 S.Ct. at 992–93. In addition, the Court found that the ultimate fairness of the criminal justice system itself would be weakened if the prosecutor's immunity were not absolute, since the triers of fact in criminal cases would be denied relevant evidence and post-conviction review could be skewed. *Id.* at 426–28, 96 S.Ct. at 993–94. The Court pointed out that absolute prosecutorial immunity would not leave the public powerless, since prosecutors guilty of misconduct could be punished under the criminal law or by disciplinary action of professional associations. *Id.* at 428–29, 96 S.Ct. at 994.[9]

In *Imbler,* the Court found that the activities which formed the bases of the plaintiff's claims against the prosecutor were "intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." *Imbler, supra,* 424 U.S. at 430, 96 S.Ct. at 995. The Court expressly refrained from deciding whether a prosecutor would enjoy absolute immunity when acting in an administrative or investigatory role, rather than as an advocate. *Id.* at 430–31, 96 S.Ct. at 994–95. In a footnote, the Court stated:

We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to the grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

*Id.* at 431 n. 33, 96 S.Ct. at 995 n. 33.

Justice White, joined by Justices Brennan and Marshall, concurred in the judgment. He agreed that a prosecutor is absolutely immune from suits based on knowing use of false testimony. *Imbler, supra,* 424 U.S. at 440, 96 S.Ct. at 999 (White, J., concurring in judgment). Unlike the majority, however, he would have held that a prosecutor should not be absolutely immune from claims of unconstitutional suppression of exculpatory evidence. *Id.* at 442–45, 96 S.Ct. at 1000–02 (White, J., concurring in judgment). The

---

ing functions analogous to those of a prosecutor are absolutely immune from suit for damages arising out of such actions). *Cf. Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (state judges are absolutely immune from liability for damages for their judicial acts); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (same).

**9.** Of course, a prosecutor's use of perjured testimony may form the basis for post-conviction relief, *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), as may a prosecutor's suppression of evidence favorable to an accused who has requested it, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or even (if the evidence creates a reasonable doubt as to the defendant's guilt, which doubt would not otherwise exist) to an accused who has not requested it. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

majority unequivocally rejected this distinction:

> We do not accept the distinction urged by Mr. Justice White for several reasons. As a matter of principle, we perceive no less an infringement of defendant's rights by the knowing use of perjured testimony than by the deliberate withholding of exculpatory information.... Moreover, the distinction is not susceptible of practical application. A claim of using perjured testimony simply may be reframed and asserted as a claim of suppression of the evidence on which the knowledge of perjury tested.

*Id.* at 431 n. 34, 96 S.Ct. at 995 n. 34.

■ With the *Imbler* standard in mind, the court turns to consider the specific claims against former Attorney General Wilentz. The claims asserted against Wilentz in ¶¶ 19, 26, 27, 29, 48, 49 and 52 of the Amended Complaint, ¶¶ 33–4(1),[10] 33–4(2), 33–6, 33–7, 60–10 and 60–15 of the Second Amended Complaint, and ¶ 33–10 of the Third Amended Complaint are based, in whole or in part, on his alleged use of false testimony or his suppression of exculpatory evidence at trial. There can be no doubt that a prosecutor is absolutely immune from suit for damages[11] on such claims. *See Imbler, supra; Siano v. Justices of Massachusetts,* 698 F.2d 52, 57–58 (1st Cir.1983) (prosecutor enjoys absolute immunity from claims that he knowingly allowed the state to use forged evidence at trial); *Briscoe v. LaHue,* 663 F.2d 713, 721–22 (7th Cir.1981) (absolute immunity for prosecutors on

claims that they knowingly used perjured evidence), *aff'd,* —— U.S. ——, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir.1979) (prosecutors absolutely immune on claims that they used perjured testimony and suppressed exculpatory evidence); *Hampton v. Hanrahan,* 600 F.2d 600, 633 (7th Cir.1979) (absolute immunity for prosecutors on claim of deliberate preparation of perjured testimony), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980);[12] *Blevins v. Ford,* 572 F.2d 1336, 1339 (9th Cir.1978) (prosecutor absolutely immune from suit on claim that he knowingly used perjured testimony at trial, and conspired with law enforcement officers to conceal the perjury from the court); *Heidelberg v. Hammer,* 577 F.2d 429, 432 (7th Cir.1978) (absolute immunity for prosecutors on claims that they destroyed certain evidence, falsified other evidence, and induced a witness to commit perjury); *Hilliard v. Williams,* 540 F.2d 220 (6th Cir.1976) (per curiam) (absolute immunity for prosecutor on claim that he withheld evidence and presented false and misleading testimony);[13] *Brawer v. Horowitz,* 535 F.2d 830, 834 (3d Cir.1976) (prosecutor absolutely immune from suit on claims that he conspired with a witness to use perjured testimony and to conceal exculpatory evidence); *Kauffman v. Moss,* 420 F.2d 1270, 1272–73 (3d Cir.) (prosecutor absolutely immune from suit on claim that he conspired with police officers to secure convictions by knowing use of perjured testimony), *cert.*

---

**10.** The Second Amended Complaint contains two paragraphs labeled 33–4. The court will refer to the first as 33–4(1) and the second as 33–4(2).

**11.** Since plaintiff seeks only damages, and not injunctive relief, against Wilentz, the court need not consider whether absolute prosecutorial immunity would extend to actions for injunctive relief under § 1983.

**12.** Plaintiff, in her brief, mistakenly cites this case for the opposite conclusion. In a pre-*Imbler* decision in the same case, *Hampton v. City of Chicago,* 484 F.2d 602, 609–10 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974), then-Judge Ste-

vens had decided that prosecutors were not absolutely immune from suit on claims that they had deliberately prepared perjured testimony. When the issue arose again after *Imbler,* however, the court reversed its position. *Hampton v. Hanrahan,* 600 F.2d 600, 633 (7th Cir.1979).

**13.** The *Hilliard* court had originally held that the prosecutor was not absolutely immune from suit on this claim. *Hilliard v. Williams,* 516 F.2d 1344, 1350 (6th Cir.1975). The Supreme Court summarily vacated that holding and remanded for consideration in light of *Imbler. Williams v. Hilliard,* 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729 (1976). On remand, the court reached the opposite result.

*denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *Bethea v. Reid,* 445 F.2d 1163, 1165–66 (3d Cir.1971) (prosecutor absolutely immune from suit on claims that he conspired with FBI agents to use perjured testimony and to seize property illegally), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972).

■ *Henderson v. Fisher,* 631 F.2d 1115, 1120 (3d Cir.1980) (per curiam), cited by plaintiff, is not to the contrary. In *Henderson,* the plaintiff brought a § 1983 suit against a prosecutor, alleging that he had knowingly failed to stop the removal of exculpatory physical evidence from a police locker on the morning of the plaintiff's trial. The court found the question a "very close" one, *id.,* but held that the prosecutor did not enjoy absolute immunity, since it was difficult to characterize the removal of such material as "'presenting the state's case.'" *Id.* (quoting *Imbler, supra,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33). In this case, however, plaintiff has not alleged that defendant Wilentz permitted the removal or destruction of any evidence; her claims are based on his decisions regarding the use or non-use of evidence at trial and thus fall squarely within *Imbler. Cf. Wilkinson v. Ellis,* 484 F.Supp. 1072, 1082–84 (E.D.Pa. 1980) (holding that a prosecutor would enjoy only qualified immunity from a claim that he had destroyed a tape-recorded confession which would have exculpated the plaintiff, but stating that even the prosecutor's allegedly false testimony as to the existence of exculpatory evidence is entitled to absolute immunity).[14]

■ Plaintiff also alleges that defendant Wilentz withheld exculpatory evidence from the Court of Pardons and the Governor after trial. Amended Complaint ¶¶ 32, 59; Second Amended Complaint ¶¶ 33–6, 60–15; Third Amended Complaint ¶ 33–10. Since appeals, habeas corpus proceedings, and proceedings before the Court of Pardons are all "intimately associated with the judicial phase of the criminal process," *Imbler, supra,* 424 U.S. at 430, 96 S.Ct. at 995, the prosecutor must be granted absolute immunity for decisions regarding the presentation of the state's case at each of these stages. *See Briscoe v. LaHue, supra,* 663 F.2d at 721–22 (prosecutors have absolute immunity from suits based on claims that they withheld material evidence from appellate tribunals); *Henzel v. Gerstein, supra,* 608 F.2d at 657 (*Imbler* extends to appeals); *Bruce v. Wade,* 537 F.2d 850, 852 (5th Cir.1976) (*Imbler* extends to habeas corpus proceedings).

■ Plaintiff also asserts that Wilentz continued to conceal exculpatory evidence after leaving office. Amended Complaint ¶¶ 26, 33, 60. A prosecutor's immunity depends on the nature of his conduct, not on his status at the time of suit. *See Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). Continuing concealment of exculpatory evidence cannot be considered an act separate from the original decision to withhold evidence.[15] If a plaintiff could circumvent *Imbler* merely by waiting until the prosecutor leaves office before bringing suit, then prosecutorial immunity would be meaningless and the policies behind it would be vitiated.

14. New Jersey's definition of prosecutorial immunity has no relevance to plaintiff's federal claims, which must be interpreted in the light of the policy considerations underlying § 1983. Thus the court will not consider plaintiff's argument that Wilentz would be liable under New Jersey law for concealing exculpatory evidence and using false or misleading testimony at trial.

15. If continuing concealment were viewed as a separate act, plaintiff would have no cause of action under § 1983 (assuming that Wilentz left office after Hauptmann's execution). This

claim depends on the survival of her decedent's cause of action. *See supra* n. 6. A person's civil rights cannot be violated once that person has died; thus a cover-up of the circumstances surrounding a person's death cannot violate that person's rights. *Silkwood v. Kerr-McGee Corp.,* 637 F.2d 743, 749 (10th Cir.1980), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981); *Guyton v. Phillips, supra.* If Wilentz left office after Hauptmann died and the continuing concealment is a separate act, Hauptmann (being dead) has no cause of action, and *a fortiori* plaintiff has none.

Wilentz's absolute immunity extends to this claim also.

"An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler, supra,* 424 U.S. at 419 n. 13, 96 S.Ct. at 989 n. 13. Defendant Wilentz is absolutely immune from suit on all claims that he violated Hauptmann's constitutional rights (or plaintiff's own constitutional rights) by using false, perjured or misleading evidence or by concealing exculpatory evidence, before, during, or after trial. The portions of the amended complaints that relate to those claims must be dismissed with prejudice.

### B. Claims Based on Authorization and Use of Illegal Investigative Techniques

Plaintiff asserts that Wilentz conspired with members of the New Jersey State Police force (including defendants Stockburger, Bornmann, Wolf, Wallace and Horn) and with FBI agent Sisk to employ illegal investigative techniques to obtain information which could be used against Hauptmann at trial. Specifically, she alleges that Wilentz authorized illegal wiretapping, Second Amended Complaint ¶¶ 33–4(2), 60–10, and eavesdropping, *id.* ¶¶ 33–2, 60–10, Third Amended Complaint ¶ 33–12, and that he conspired with the police to "burglarize" the luggage of a defense investigator, Second Amended Complaint ¶ 33–5. The court will consider each of these claims in turn.

*1. Wiretapping.* Plaintiff alleges that Wilentz authorized warrantless wiretaps of the telephones of "defense personnel and others." Second Amended Complaint ¶ 60–10. The only allegation which approaches any detail at all is the statement that the police "tapp[ed] the telephone of a defense investigator and intercept[ed] conversations between he [*sic*], his spouse, and others." *Id.* ¶ 33–4(2). Plaintiff asserts that the alleged wiretapping violated Hauptmann's first, fourth, fifth, sixth and fourteenth amendment rights.

The claim based on a fourth amendment violation is the most plausible of these; it must be dismissed, however, for a number of reasons. First, plaintiff lacks standing to assert this claim. · Fourth amendment rights are personal rights that may not be vicariously asserted. *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978); *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). In *Rakas, supra,* the Supreme Court unequivocally rejected the argument that any criminal defendant at whom a search was directed would have standing to contest the validity of the search; the Court held, instead, that a person claiming the protection of the fourth amendment must have a "legitimate expectation of privacy" in the invaded place. 439 U.S. at 143, 99 S.Ct. at 430. *See also United States v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983); *Rawlings v. Kentucky,* 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). Even assuming that plaintiff could assert Hauptmann's rights, *supra* n. 7, she does not allege that Hauptmann's own telephone conversations were monitored, but only those of an unnamed defense investigator with unnamed "others." Hauptmann would have had no expectation of privacy in the investigator's telephone, and plaintiff cannot assert the defense investigator's rights merely because her husband may have been the target of the surveillance of conversations between the investigator and third parties.

Assuming *arguendo* that plaintiff has standing to assert such a claim, she has not alleged that the warrantless wiretapping resulted in any injury to Hauptmann. She does not allege that the police overheard any incriminating information, that they passed any information on to Wilentz, or that Wilentz used any such information against Hauptmann at trial.[16]

16. The court recognizes that the plaintiff in a

§ 1983 case may recover nominal compensato-

Finally, even assuming that plaintiff had standing and that Hauptmann had been injured by the wiretaps, Wilentz would be entitled to at least qualified immunity on this claim, if not absolute immunity. Investigation is not as clearly "associated with the judicial phase of the criminal process," *Imbler, supra,* 424 U.S. at 430, 96 S.Ct. at 995, as decisions about the initiation and presentation of the state's case are. As noted, *supra* p. 365, the Supreme Court in *Imbler* did not delineate the precise boundaries of the prosecutor's absolute immunity. The Court suggested, however, that although preparation for the initiation of the criminal process and for trial "may require the obtaining, reviewing, and evaluating of evidence," at some point the prosecutor no doubt functions as an administrator or investigator rather than as an advocate or an officer of the court. *Id.* at 430–31 & n. 33, 96 S.Ct. at 995 & n. 33. The Third Circuit in *Forsyth, supra,* 599 F.2d at 1214–15, adopted a functional approach, holding that a prosecutor enjoys absolute immunity when acting in a "quasi-judicial" role, but is entitled only to qualified immunity when acting in an investigative capacity. *See also Ross v. Meagan,* 638 F.2d 646, 648 (3d Cir.1981); *Mancini v. Lester,* 630 F.2d 990, 992–93 (3d Cir.1980). A number of other circuits have adopted the same approach. *See, e.g., Freeman v. Hittle,* 708 F.2d 442 (9th Cir.1983); *Taylor v. Kavanagh,* 640 F.2d 450, 452 (2d Cir.1981); *Marrera v. City of Hialeah,* 625 F.2d 499, 507 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *Halperin v. Kissinger,* 606 F.2d 1192, 1208 (D.C.Cir.1979), *aff'd by equally divided Court per curiam,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981); *Jacobson v. Rose,* 592 F.2d 515, 524 (9th Cir.1978), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Atkins v. Lanning,* 556 F.2d 485, 488–89 (10th Cir.1977); *Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir.1974); *McCray v. Maryland,* 456 F.2d 1 (4th Cir.1972). The Supreme Court recently approved *Mancini* and *Forsyth,*

ry damages if she cannot show actual injury. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55

saying that the Court in *Butz v. Economou,* 438 U.S. 478, 515–17, 98 S.Ct. 2894, 2915–16, 57 L.Ed.2d 895 (1978), had implicitly drawn the same distinction. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2735 n. 16, 73 L.Ed.2d 396 (1982).

The Third Circuit in *Forsyth, supra,* considered a claim that the former Attorney General of the United States had authorized warrantless electronic surveillance which resulted in violations of the plaintiffs' rights. The Attorney General argued that he was absolutely immune from suit on this ground. The Third Circuit, characterizing the Attorney General's actions as falling within a "gray area," *id.* at 1215, stated:

We recognize that the decision of the Attorney General, or a prosecuting attorney, to initiate a prosecution is not made in a vacuum. On occasion, the securing of additional information may be necessary before an informed decision can be made. To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decision-making and the potential for needless actions. We believe that the right to make the decision without being subject to suit must include some limited right to gather necessary information. At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of a prosecutor's investigative activities. We hold only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself.

*Id.* The court did not decide whether the Attorney General was entitled to absolute or qualified immunity, in the circumstances; it remanded the case for further consideration. On remand, the district court found

L.Ed.2d 252 (1978).

that the Attorney General was entitled only to qualified immunity, since the purpose of the surveillance was not "to determine whether and whom to prosecute," but rather was to obtain information to prevent criminal plots of which the Attorney General was already aware. *Forsyth v. Kliendienst,* 551 F.Supp. 1247, 1252 (E.D.Pa. 1983).[17]

In this case, Wilentz allegedly authorized an illegal wiretap after Hauptmann had been indicted and while he was awaiting trial. Taking this allegation, as we must, as true, if Wilentz had already decided to prosecute Hauptmann, his action would probably not fall within the zone of absolute immunity for securing information "necessary to a prosecutor's decision to initiate a criminal prosecution." *Forsyth, supra,* 599 F.2d at 1215. Thus, were we to avoid the standing and lack of injury issues, we would then have to deal with what Wilentz would be entitled to raise, the defense of qualified immunity on this claim.[18]

Notwithstanding that plaintiff's lack of standing and injury compels the striking of the wiretapping claim, the court will briefly discuss the qualified immunity doctrine.

■ Qualified immunity shields an official from liability for § 1983 damages "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2738.[19] Prior to *Harlow,* a government official had to satisfy both an objective and a subjective test in order to obtain qualified immunity: the Court inquired whether the official knew or reasonably should have known that his action would violate the plaintiff's constitutional rights, and whether he took the action with malicious intent. *See Harlow, supra,* 102 S.Ct. at 2737; *Procunier v. Navarette,* 434 U.S. 555, 562–63, 98 S.Ct. 855, 859–60, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). In *Harlow,* however, the Court abolished the subjective prong of the test. 102 S.Ct. at 2738. The Court intended the new standard to allow resolu-

17. This decision is currently on appeal to the Third Circuit. *See Forsyth v. Kleindienst,* 700 F.2d 104 (3d Cir.1983) (opinion sur grant of stay, referring to the merits panel the plaintiff's motion to dismiss the defendant's appeal from the denial of qualified immunity).

18. Most of the reported cases involving prosecutorial immunity from liability for illegal searches and seizures have held that the search or seizure constituted investigative activity, entitling the prosecutor to qualified immunity only. *See, e.g., Sinclair v. Kleindienst,* 645 F.2d 1080, 1081 (D.C.Cir.1981) (former Attorney General entitled to qualified immunity on claim that he conducted illegal wiretaps to protect national security); *Marrero v. City of Hialeah,* 625 F.2d 499, 505 (5th Cir.1980) (prosecutor entitled to qualified immunity on claim that he participated in illegal preindictment search and seizure); *Hampton, supra,* (prosecutors entitled to qualified immunity on claims arising out of illegal search, seizure, and raid directed against militant black group); *Jacobson v. Rose,* 592 F.2d 515, 524 (9th Cir.1978) (prosecutor entitled to qualified immunity on claim that he implemented illegal wiretap to obtain information about possible kidnapping); *Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir.1974) (prosecutor not absolutely immune on claim that he cooperated with police officers to obtain wiretap order on basis of perjured testimony); *J.D. Pflaumer, Inc. v. U.S. Dep't of Justice,*

450 F.Supp. 1125, 1133 (E.D.Pa.1978) (prosecutor entitled to qualified immunity on claim that he directed illegal seizure of evidence to support presentation to grand jury); *Lofland v. Meyers,* 442 F.Supp. 955, 958 (S.D.N.Y.1977) (prosecutor entitled to qualified immunity on claim of illegal search and seizure). One exception is *Drug Purchase, Inc. v. Dubroff,* 485 F.Supp. 887, 892 (S.D.N.Y.1980); in that case, the court held that a prosecutor was absolutely immune from suit on an illegal search claim, but there was no dispute about the fact that he was acting in his prosecutorial, rather than his investigative, role at the time of the search.

19. *Harlow* was a *Bivens*-type action brought directly under the Constitution against federal officials. *See Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Taking their cue from *Harlow,* 102 S.Ct. at 2738 n. 30, however, lower courts have freely applied the "objective reasonableness" standard to § 1983 actions. *See, e.g., Brewer v. Blackwell,* 692 F.2d 387, 399 n. 12 (5th Cir. 1982); *Scott v. Plante,* 691 F.2d 634, 639 (3d Cir.1982); *Wolfel v. Sanborn,* 691 F.2d 270, 272 (6th Cir.1982). Courts also readily find that *Harlow* is to be applied retroactively. *See, e.g., Scott, supra; Wolfel, supra; Druckenmiller v. United States,* 553 F.Supp. 917 (E.D.Pa.1982).

tion of a greater number of insubstantial claims by summary judgment. *Id.* 102 S.Ct. at 2737–38. As the Court stated,

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should ... permit the resolution of many unsubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed.

*Id.* 102 S.Ct. at 2739 (footnotes omitted). The language of this passage ("the judge ... may determine") makes it clear that the state of the law at the time of the official's action and the reasonableness of his conduct, in relation to that law, are questions of law to be decided by the court, and at least one court within this circuit has so held. *Forsyth v. Kleindienst, supra,* 551 F.Supp. at 1260–61.[20] This court believes that these issues are questions of law and thus may be decided by the court on this motion to dismiss.

■ An examination of the law in effect at the time of the alleged wiretapping shows that Wilentz could not reasonably have known that such wiretapping would violate Hauptmann's fourth amendment rights. In *Olmstead v. United States,* 277 U.S. 438, 462–64, 48 S.Ct. 564, 567–68, 72 L.Ed. 944 (1928), the Supreme Court held that warrantless electronic surveillance did not violate the fourth amendment, since there was no trespass and no tangible things were seized. The trespass rationale remained the law for nearly forty years after *Olmstead,*[21] until overruled in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In addition, the fourth amendment was not applied to the states until *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), fourteen years after the Hauptmann trial. Thus Wilentz could not be said to have violated Hauptmann's rights unless both *Wolf* and *Katz* were retroactive. It is unnecessary to engage in any discussion of retroactivity, however, since even if those doctrines were retroactive, Wilentz would be immune under *Harlow.* Wilentz could not be expected to anticipate Supreme Court decisions that were far in the future. Even if he authorized a warrantless wiretap in 1934 or 1935, and this claim were otherwise viable (that is, plaintiff had standing and suffered injury), Wilentz did not violate "clearly established constitutional or statutory rights of which a reasonable person would have known," *Harlow, supra,* 102 S.Ct. at 2738, and he would be entitled to immunity from suit for the alleged violations of Hauptmann's fourth amendment rights.

■ Plaintiff also asserts that the alleged wiretapping violated Hauptmann's first, fifth, sixth and fourteenth amendment rights. Second Amended Complaint, ¶ 60–10. Since plaintiff does not specify how the wiretaps interfered with Hauptmann's exercise of his rights of speech, press, assembly, petition or religion, any

---

**20.** The Third Circuit in *Forsyth v. Kleindienst, supra,* 700 F.2d at 105 n. 2, noted but did not comment on this holding. Before *Harlow* was decided, the Third Circuit had stated that a qualified immunity defense could not be asserted under Fed.R.Civ.P. 12(b)(6), but could only be asserted in a summary judgment proceeding or at trial. *Black v. Bayer,* 672 F.2d 309, 316 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982). This requirement was understandable when the test of qualified immunity was "the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief." *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974). After *Harlow*'s abolition of the subjective portion of the qualified immunity test, however, this court believes the Third Circuit would change its view.

**21.** *See, e.g., Silverman v. United States,* 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

claim based on the first amendment is insufficiently pleaded. *See infra* p. 375. Likewise, the complaint does not set out facts necessary to allege a fifth amendment violation. In order for Hauptmann's right against self-incrimination to have been violated, his own telephone conversations would have to have been overheard; plaintiff, however, alleges only that the conversations of a defense investigator and other third parties were intercepted. Plaintiff also fails to allege that Hauptmann was compelled to speak. Even assuming that plaintiff had stated a fifth amendment claim, Wilentz would be immune from suit. The fifth amendment was not applied to the states until *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). In addition, at the time of the alleged wiretapping *Olmstead, supra,* held that wiretapping did not violate the fifth amendment unless it first violated the fourth amendment. Since warrantless wiretapping was held not to violate the fourth amendment at that time, *id.* 277 U.S. at 462–64, 48 S.Ct. at 567–68, a reasonable person would not have concluded that it violated the fifth amendment. Thus, even if *Malloy* were retroactive, Wilentz would be immune under the *Harlow* test.

Plaintiff fails to plead facts sufficient to state a claim for violation of Hauptmann's sixth amendment rights, since she does not state that confidential information was obtained from the defense investigator or that any such information was used against Hauptmann at trial. *See Weatherford v. Bursey,* 429 U.S. 545, 551–52, 97 S.Ct. 837, 841–42, 51 L.Ed.2d 30 (1977). Even if she had done so, Wilentz would be immune under *Harlow.* The sixth amendment right to counsel was not applied to the states until *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). It is not necessary to decide whether the *Gideon* doctrine was retroactive, since Wilentz could not reasonably be expected to have known of that doctrine in 1934 or 1935, and thus is entitled to immunity from a claim that he violated Hauptmann's sixth amendment rights.

Finally, plaintiff asserts that the alleged wiretapping violated a New Jersey statute known as the Act of April 18, 1930, ch. 215, 1930 N.J.Laws 987, which made wiretapping a misdemeanor. Violation of state law, in and of itself, cannot form the basis of a § 1983 action. If the violation deprives the plaintiff of a protected "liberty" or "property" interest without first providing due process, however, the plaintiff can bring a § 1983 action based on violation of the fourteenth amendment. *See, e.g., Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Roth v. Board of Regents,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Although plaintiff does not spell out her fourteenth amendment argument, presumably it is based on Wilentz's alleged violation of the New Jersey wiretapping statute. This claim is no more viable than any of her other wiretapping claims. Even assuming that plaintiff had standing, which is highly questionable, there is no way to assess the impact of the alleged wiretapping upon any then-existent liberty or property interest, since the contents of the conversation are not alleged, nor is it alleged for what purpose and at what stage of the proceedings the knowledge gained by the alleged wiretapping was used against Hauptmann, if used at all. Moreover, even assuming the analysis of *Roth, supra,* and its progeny is to be retroactively applied, plaintiff has cited no case holding that a state criminal statute creates an individual liberty or property interest. Finally, even if plaintiff were to overcome all of these shortcomings, she would still encounter the bars of absolute immunity (as to Wilentz, if she alleges that his use of illegally obtained information at trial deprived Hauptmann of a protected interest) and qualified immunity (as to the others alleged to have participated in the wiretapping, and as to Wilentz insofar as her allegations are not based on use of information at trial).

■ Plaintiff's claims based on Wilentz's alleged authorization of wiretapping must be dismissed. The claims that the alleged wiretapping violated Hauptmann's fourth, fifth, and sixth amendment rights are dismissed with prejudice since, even if the defects in standing and pleading could be cured, Wilentz is immune from suit on those claims under *Harlow.* The claims that Wilentz violated Hauptmann's first and fourteenth amendment rights by authorizing wiretaps are dismissed without prejudice. However, before an amended complaint is filed in an effort to cure these and other defects, motion for leave therefor is to be filed, and the defendants will have an opportunity to explore through discovery the bases and sources of information supporting the proposed amendments, coming as they do after four amended complaints have been served and filed and plaintiff has had substantial document discovery. *Cf.* Fed.R.Civ.P. 11.

■ *2. Eavesdropping.* Next, plaintiff claims that Wilentz authorized State Police Officer Hugo Stockburger and others to eavesdrop on Hauptmann while he was incarcerated. Second Amended Complaint ¶¶ 33–2, 60–10; Third Amended Complaint ¶ 33–2. Plaintiff states that Wilentz was thus privy to confidential attorney-client communications involving "trial strategy, plans, and testimony." Third Amended Complaint ¶ 33–12. Since plaintiff alleges that Hauptmann's conversations (and her own) were overheard, she has standing to assert this claim.

■ The eavesdropping, like the wiretapping, allegedly occurred after Wilentz had already decided to prosecute Hauptmann. If this is so, since the information was not necessary for the initiation of a prosecution, Wilentz would be acting in an investigative, rather than a quasi-judicial, role and would be entitled to qualified immunity under *Forsyth, supra,* 599 F.2d 1203. *See supra* pp. 369–371. Once again, however, Wilentz satisfies the *Harlow* test of immunity, since his alleged conduct would not violate clearly established statutory or constitutional rights. Plaintiff has

cited no cases to show that eavesdropping was held to violate the fourth amendment at the time Wilentz allegedly authorized Stockburger's action, and the court is aware of none. Even today, it is not clear that eavesdropping on a prisoner's conversations would violate his constitutional rights. The Supreme Court has recently ruled that a prisoner has, at best, a reduced expectation of privacy in his cell:

> It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person. In any case, given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope.

*Bell v. Wolfish,* 441 U.S. 520, 556–57, 99 S.Ct. 1861, 1883, 60 L.Ed.2d 447 (1979) (citations omitted). In any event, as noted above, the fourth amendment was not applied to the states until 1949, *Wolf v. Colorado, supra,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782; even if the *Wolf* doctrine is retroactive, Wilentz could not have known of it.

■ Plaintiff also argues that the alleged eavesdropping violated Hauptmann's first, fifth, sixth and fourteenth amendment rights. Again, plaintiff's first amendment claim is insufficiently pleaded, as she fails to specify how the alleged eavesdropping interfered with Hauptmann's exercise of his first amendment rights. *See infra* p. 375. Plaintiff fails to state a fifth amendment claim, since she does not allege that Wilentz compelled Hauptmann to speak, or that the statements overheard were self-incriminating. Even if she had done so, Wilentz would be immune from suit under *Harlow,* since the fifth amendment was not applied to the states until *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). *See supra* p. 372. The sixth amendment claim must also be dismissed. First, plaintiff fails to state how the alleged eavesdropping deprived Hauptmann of the effective

assistance of counsel. Although she alleges that conversations with his attorneys were overheard, Third Amended Complaint, ¶ 33–12, she does not say when they were overheard or by whom. Nor does she allege that Hauptmann was injured by use of information gleaned by eavesdropping. In fact, the opposite is true: she charges Wilentz with ignoring conversations which showed that Hauptmann was a "warm, tender and loving person," and portraying him instead at trial as a "cold, unemotional and hardened individual." Second Amended Complaint, ¶ 33–2.[22] Beyond this, plaintiff does not describe the content of the conversations or their use. Second, even assuming that plaintiff had provided sufficient facts to support a claim based on interference with effective assistance of counsel, Wilentz would be entitled to immunity under *Harlow*. Since the sixth amendment right to counsel was not applied to the states until *Gideon v. Wainwright, supra,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, the right was not a "clearly established . . . constitutional right[] of which a reasonable person would have known." *Harlow, supra,* 102 S.Ct. at 2738. *See supra* p. 373.

■ Although the Supreme Court, at the time of the Hauptmann trial, did not recognize a sixth amendment right to the effective assistance of counsel in state prosecutions, it did recognize a right to counsel under the fourteenth amendment in some situations. *See Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), discussed *infra* at 374–375. Since plaintiff has not alleged facts in this § 1983 suit that would show deprivation of effective assistance of counsel, however, the court need

not now decide whether Wilentz would be immune from suit on this claim.[23]

Plaintiff's claims based on Wilentz's alleged authorization of eavesdropping must be dismissed. The claims that the alleged eavesdropping violated Hauptmann's fourth, fifth, and sixth amendment rights are dismissed with prejudice, since Wilentz is immune from suit on those claims under *Harlow*. The claims that Wilentz violated Hauptmann's first and fourteenth amendment rights are dismissed without prejudice.

■ *3. "Burglarizing" defense investigator's luggage.* Plaintiff next alleges that Wilentz conspired with the State Police to "burglarize" a defense investigator's luggage. Plaintiff states that defendant Bornmann opened the unnamed investigator's luggage, read and copied papers and letters, and carried away at least one photograph. Second Amended Complaint ¶ 33–5.[24] Her only allegation regarding Wilentz is that he "acted in a conspiracy" with Bornmann and others. *Id.* She provides no details which would link Wilentz and the police officer in any way, nor does she allege any facts which would tend to show the existence of an agreement. As it stands, this claim of conspiracy fails to meet the standard that the Third Circuit has consistently stated.

■ The Third Circuit requires "that a civil rights complaint contain a modicum of specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs." *Ross v. Meagan, supra,* 638 F.2d at 650; *see United States v. City of Philadelphia,* 644 F.2d 187, 204 (3d Cir.1980); *Rotolo v. Borough of*

---

**22.** This does not even rise to the level of a claim that Wilentz withheld exculpatory evidence (a claim from which he would be immune, in any event, under *Imbler*). If Hauptmann was indeed a warm and loving person, this would have been known to him and to his lawyers; they would have been free to present it to the jury as part of the defense case.

**23.** Indeed, in the absence of specific facts the court cannot decide this issue. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), was expressly limited to its facts. In order to decide whether *Powell* established a

constitutional right to counsel of which Wilentz would have known, the court would need to know how closely the circumstances of the Hauptmann case resembled those in *Powell*.

**24.** Plaintiff does not describe the contents of the papers and letters, nor does she describe the photograph. She does not allege that any of these materials were used against Hauptmann at trial and does not negate the likelihood that Hauptmann and his investigator knew what objects were allegedly taken.

*Charleroi,* 532 F.2d 920, 922–25 (3d Cir.1976) (per curiam); *Ammlung v. City of Chester,* 494 F.2d 811, 814 (3d Cir.1974); *Esser v. Weller,* 467 F.2d 949, 950 (3d Cir.1972); *Robinson v. McCorkle,* 462 F.2d 111, 113 (3d Cir.1972), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972); *Kauffman v. Moss,* 420 F.2d 1270, 1275 (3d Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *see also Mokone v. Fenton,* 710 F.2d 998, 1002 n. 12 (3d Cir.1983). A bare claim of conspiracy is not sufficient. As Judge Broderick recently stated in *Chicarelli v. Plymouth Garden Apartments,* 551 F.Supp. 532 (E.D.Pa.1982):

> It is not enough, however, for a plaintiff to make merely broad or conclusory allegations concerning the existence of . . . a conspiracy . . . . Rather, plaintiffs must allege with sufficient particularity that the [defendants] reached some understanding or agreement, or plotted, planned and conspired together, to deprive plaintiffs of a federal right.

*Id.* at 539 (citations omitted). This requirement is necessary to protect defendants from the unwarranted expense, vexation, and possible notoriety which defense against frivolous claims entails. *Rotolo, supra,* 532 F.2d at 922; *Kauffman, supra,* 420 F.2d at 1276 n. 15. In this case, since plaintiff has failed to allege specific facts to show that Wilentz conspired with the state police defendants to search the defense investigator's luggage and to seize items contained therein, this claim must be dismissed without prejudice.

■ *4. Conspiracy to intercept correspondence.* Plaintiff alleges that unspecified defendants conspired "to intercept and illegally withhold correspondence to and from [Hauptmann]" while Hauptmann was incarcerated. Third Amended Complaint ¶ 33–11. This is simply a conclusory allegation. It must be dismissed without prejudice for failure to comply with *City of Philadelphia, supra, Rotolo, supra,* and other Third Circuit cases requiring specificity in civil rights complaints.

*C. Other Claims Against Wilentz*

Finally, plaintiff asserts that Wilentz conspired with the state police to contaminate the jury which heard Hauptmann's case, Second Amended Complaint ¶ 33–3; that he failed to return items of personal property taken from the Hauptmann home, Amended Complaint ¶ 28; that he failed to supervise the state police defendants whose actions are described elsewhere in the complaint, *id.* ¶¶ 39, 42; that he created "an atmosphere of lawlessness" within the state police force, *id.* ¶ 40; that he coerced a defense witness not to testify to a particular fact, *id.* ¶¶ 29, 60–13; that he made inflammatory statements to the press, *id.* ¶ 31; that he, together with other defendants, inflicted cruel and unusual punishment on Hauptmann, *id.* ¶ 36, Second Amended Complaint ¶ 60–3; that he conspired with defendant Hearst to deprive Hauptmann of his right to a fair trial, Amended Complaint ¶ 22; that he conspired with other defendants to use anti-German prejudice to deprive Hauptmann of his rights, Second Amended Complaint ¶ 60–14; and that he, together with other defendants, deprived Hauptmann of his right to privacy and his right to counsel, Amended Complaint ¶ 56, Second Amended Complaint ¶¶ 60–8, 60–11.

In addition, plaintiff argues that Wilentz's violations of her husband's rights, taken together, add up to a fraud on the judicial system and a violation of the due process clause of the fourteenth amendment. The court will consider this argument after considering the remaining individual claims.

■ *1. Jury contamination.* Plaintiff claims that "the New Jersey State Police engaged in conduct tantamount to jury contamination" by engaging prospective jurors in conversation concerning the Hauptmann case and by rejecting one constable who had been assigned to guard the jury because he had had business dealings with one of the defense attorneys. Second Amended Complaint, ¶ 33–3. Plaintiff alleges that Wilentz conspired with the police to influence the jury, but provides no details to show the

existence of agreement. This conclusory allegation must be dismissed without prejudice for failure to plead with sufficient particularity. *See supra* p. 375.

 *2. Failure to return personal property.* Plaintiff next alleges that "[T]he New Jersey State Police, including . . . David T. Wilentz" failed to return items of personal property confiscated from the Hauptmann home on September 19, 1934. Amended Complaint ¶ 28.[25] This claim is clearly time-barred. Since Congress has provided no statute of limitations for § 1983 claims, the court must apply the most closely analogous state statute. *Board of Regents v. Tomanio,* 446 U.S. 478, 484–86, 100 S.Ct. 1790, 1795–96, 64 L.Ed.2d 440 (1980); *accord Chardon v. Soto,* —— U.S. ——, ————, 103 S.Ct. 2611, 2615–19, 77 L.Ed.2d 74 (1983); *Aitchison v. Raffiani,* 708 F.2d 96, 100–03 (3d Cir.1983); *Knoll v. Springfield Township School District,* 699 F.2d 137, 140 (3d Cir.1983); *cf. Kocian v. Getty,* 707 F.2d 748, 750–52 (3d Cir.1983) (Title VII). Plaintiff's claim is analogous to an action for conversion. The right of action accrued in 1934, since she knew or should have known that the items listed in the Amended Complaint ¶ 28, were missing soon after they were taken. N.J. S.A. 2A:14–1 bars actions for conversion which are not brought within six years after the cause of action accrued. This claim is well outside the statute.

 *3. Failure to supervise state police officers.* Plaintiff alleges that Wilentz is directly liable and responsible for the acts of the state police defendants because he failed to provide adequate training and supervision for them and failed to discipline and control them. Amended Complaint ¶¶ 39, 42. Although there is no respondeat superior liability under § 1983, the court will assume *arguendo* that Wilentz could be liable under § 1983 if he had direct supervisory authority over police officers who violated Hauptmann's constitutional rights. *See Marrero v. City of Hialeah, supra,* 625 F.2d at 505; *Hampton v. Hanrahan, supra,* 600 F.2d at 626–27; *Wilkinson v. Ellis, supra,* 484 F.Supp. at 1086–87. *But see Lee v. Williams,* 617 F.2d 320, 322 (2d Cir.) (prosecutor absolutely immune from suit on claim that he supervised police officers who "planted" a pistol in plaintiff's possession), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980). However, plaintiff has not alleged that Wilentz had supervisory authority over the New Jersey State Police.[26] The case is therefore similar to *Wilkinson, supra,* in which the court stated:

> Assuming, as we must at this juncture, that [the prosecutor] knew all he is alleged to have known with respect to patterns of police abuse, he nevertheless had no direct supervisory authority over the police. Because he had no such authority, a § 1983 suit based only on his alleged failure to supervise is untenable.

484 F.Supp. at 1087. This claim must be dismissed without prejudice.

*5. Coercion of Hans Kloeppenburg.* Plaintiff alleges that Wilentz attempted to coerce a witness, Hans Kloeppenburg, by pressuring him not to give exculpatory evidence at trial. Amended Complaint ¶ 29. According to plaintiff, Kloeppenburg wanted to testify that he was in the Hauptmann home the night one Isidore Fisch entered carrying a shoe box which, it was later learned, contained the ransom money. Plaintiff alleges that Wilentz threatened Kloeppenburg with arrest if he testified to that effect, and quotes Kloeppenburg as saying that he was so scared that " 'when I testified I never called it a shoe box. I described the size, I gave measurements the size of a shoe box, but I never used that word.' " *Id.*

---

**25.** In her description of the parties, plaintiff does not allege that Wilentz was a member of the state police force during the relevant time period, although she does make such an allegation for defendants Bornmann, Wallace, Horn, and Wolf. *See* Amended Complaint ¶¶ 6–12.

**26.** Wilentz has submitted his own affidavit, in which he states that the Attorney General had no supervisory authority over the state police before 1948; apparently plaintiff in good faith is in no position to contend otherwise. The court is treating the defendants' motions as motions to dismiss, however, and thus does not consider this submission.

Coercing a witness not to testify to an exculpatory fact is one means of withholding exculpatory evidence; thus Wilentz is absolutely immune from suit on this claim under *Imbler*. *See Lee v. Willins, supra*, 617 F.2d at 322 (prosecutor absolutely immune from claims that he compelled a witness to perjure himself and coerced false testimony from a witness). *But cf. Tomko v. Lees*, 416 F.Supp. 1137, 1139 (W.D.Pa.1976) (no absolute immunity on claims that prosecutor compelled plaintiff to act as an informant and to testify against people). Even if coercing a witness fell outside the prosecutor's "quasi-judicial" functions, plaintiff has alleged no injury, since she states that Kloeppenburg did everything but use the word "shoebox" when testifying to the jury. Wilentz did not prevent Kloeppenburg from conveying to the jury the information he sought to convey—that Fisch had entered Hauptmann's home carrying a package of certain dimensions. This claim must be dismissed with prejudice.[27]

*6. Inflammatory statements to press.* Plaintiff also claims that Wilentz violated Hauptmann's constitutional rights by "making numerous inflammatory comments for the media, which were extremely prejudicial" to Hauptmann. Amended Complaint ¶ 31. Plaintiff provides two quotations. The first is allegedly taken from the World-Telegram of January 22, 1935. The trial was in progress at that point; Wilentz, leaving the courtroom, is quoted as saying:

> We are going to wrap the kidnap ladder around Hauptmann's neck.... I mean it; that is exactly what we are going to do, and tomorrow night, we will see our case wound up tightly.

Amended Complaint ¶ 31.

The second quotation allegedly comes from the *Mirror* for January 27, 1935.

I can't help it. What a horrible thing it would be to civilization if this man got away with it. I will prove without any doubt before I am done with him that he did [*sic*] and that he did it alone. We have the facts. We have only scratched the surface. If you think that word 'boad' found in his own diary of expenses was a bombshell—wait'll you see what follows—I can't wait myself.

Amended Complaint ¶ 31. *See also id.* ¶ 22.

In some circumstances, courts have held that prosecutors enjoy only qualified immunity for their public statements. *See Marrero v. City of Hialeah, supra*, 625 F.2d at 506 (prosecutor not entitled to absolute immunity for allegedly defamatory statements that were not connected with a prosecution or initiation of a prosecution); *Hampton v. Hanrahan, supra*, 600 F.2d at 632–33 (prosecutors not entitled to absolute immunity for generation of publicity that may have caused pre-trial prejudice to defendants); *Helstoski v. Goldstein*, 552 F.2d 564, 566 (3d Cir.1977) (per curiam) (prosecutor not entitled to absolute immunity on claim that he leaked false information to the press on several occasions as part of a systematic effort, over a period of years, to discredit plaintiff and to destroy his political career). In other situations, prosecutors have enjoyed absolute immunity for their statements. *See Strong v. Slaton*, 510 F.Supp. 161, 163 (N.D.Ga.1981) (post-indictment statements which bore directly on the nature of the charges against the plaintiff); *Sperl v. Deukmejian*, 482 F.Supp. 1026, 1028–29 (C.D.Cal.1980), *aff'd*, 642 F.2d 1154 (9th Cir.1981) (allegedly prejudicial preindictment publicity); *Gutierrez v. Vergari*, 499 F.Supp. 1040, 1051 (S.D.N.Y.1980) (allegedly false, prejudicial pre-trial statements). The court need not decide whether Wilentz's immunity is absolute or qualified,

---

**27.** Plaintiff also alleges that Wilentz conspired with other defendants to force an unnamed defense witness to meet with Hauptmann in the absence of counsel. Second Amended Complaint ¶ 60-13. Plaintiff alleges only that Wilentz attempted to force the two to meet; she does not allege that a meeting occurred. Insofar as this allegation constitutes a separate claim, it too must be dismissed, since the attempt alone could not violate Hauptmann's rights.

however, since the statute of limitations has clearly run on this claim.

Since there is no federal statute of limitations for § 1983 claims, the court applies the most closely analogous state statute. *Tomanio, supra,* 446 U.S. at 484–86, 100 S.Ct. at 1795–96. Plaintiff alleges that Wilentz's statements helped to deprive Hauptmann of his right to a fair trial; this deprivation, in turn, is alleged to have caused his death. This claim may be viewed as analogous to a wrongful death claim. If the court applies New Jersey's statute of limitations for wrongful death actions, N.J.S.A. 2A:31–3, plaintiff had two years from the date of Hauptmann's death within which to bring her claim. Since plaintiff admits that Wilentz's statements were published in 1935, she knew or should have known of them in 1936, when Hauptmann died, and her claim based on the statements is now barred. If the claim is viewed as more closely analogous to a libel or slander claim, the statute of limitations is even shorter: N.J.S.A. 2A:14–3 provides that libel and slander actions must be brought within one year of the publications of the alleged slander or libel.

■ 7. *Cruel and unusual punishment.* Plaintiff also asserts that Wilentz, together with other defendants, administered cruel and unusual punishment in violation of eighth amendment rights by executing Hauptmann. Amended Complaint ¶ 36; Second Amended Complaint ¶ 60–3. Even if the eighth amendment were violable by a state officer at the time involved, Wilentz is absolutely immune from suit on this ground, since Hauptmann's alleged injury occurred as a direct result of the prosecution. *See Lee v. Willins, supra,* 617 F.2d at 322; *Martinez v. Winner,* 548 F.Supp. 278, 316 (D.Colo.1982). Even if Wilentz were not absolutely immune, plaintiff's claim would be barred by the statute of limitations. Plaintiff's right of action accrued at Hauptmann's death in 1936. If her claim is viewed as analogous to a wrongful death action, N.J.S.A. 2A:31–3 allows her two years within which to bring the case; if it is viewed as analogous to a

personal injury action, N.J.S.A. 2A:14–2 also allows two years. In either case, her eighth amendment claim is barred.

■ 8. *Conspiracy with Hearst.* Plaintiff merely alleges that Wilentz (and other defendants) conspired with defendant Hearst to deprive Hauptmann of his right to a fair trial. Amended Complaint ¶ 22. She provides no material facts to indicate that there was an agreement between Wilentz and Hearst. This claim, like the claims that Wilentz conspired with the police to contaminate the jury and to "burglarize" luggage, must be dismissed without prejudice for failure to comply with *City of Philadelphia, supra, Ross, supra, Rotolo, supra,* and other Third Circuit cases requiring specificity in civil rights complaints.

■ 9. *Conspiracy to use anti-German prejudice.* Plaintiff's claim that Wilentz conspired with Hearst and others to "take advantage of mounting class prejudice in the United States at that time against that class of national origin known as Germans and German immigrants," Second Amended Complaint ¶ 60–14, must be dismissed for the same reasons. Plaintiff has not stated any facts to show the existence of a conspiracy; nor has she alleged a specific injury. *See supra* at p. 375. In addition, insofar as her claim refers to any of Wilentz's statements at trial, Wilentz is absolutely immune from suit. The claim is dismissed.

■ 10. *Violation of Hauptmann's right to privacy and right to counsel.* Plaintiff alleges that Wilentz conspired with other defendants to violate Hauptmann's right to privacy and his right to counsel. Amended Complaint ¶ 56; Second Amended Complaint ¶¶ 60–8, 60–11. She provides no facts to detail how this was done. To the extent that these allegations are based on Wilentz's alleged participation in wiretapping, eavesdropping, interception of correspondence, and the like, they must be dismissed for the reasons stated above. To the extent that they are not based on those events, they are conclusory and must be dismissed with leave to amend.

*D. Due Process Claim*

Finally, plaintiff argues that all of the separate acts that Wilentz is alleged to have committed (presentation of false evidence, concealment of exculpatory evidence, wiretapping, eavesdropping, and all of the other acts discussed above) add up to a "fraud upon the judicial system," Third Amended Complaint ¶ 33–10, and a violation of due process. Essentially, plaintiff contends that the entire prosecutorial process was a travesty of justice that deprived Hauptmann of his right to a fair trial. Since the trial resulted in a guilty verdict and ultimately in execution, plaintiff argues that Wilentz, in conspiracy with other defendants, denied Hauptmann his life and liberty without due process of law. She asserts that the state defendants, including Wilentz, are not immune from suit on this claim because it was clearly established, in 1934 and 1935, that a state violated due process if it "contrived a conviction through the pretense of a trial which in truth [was] but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury." *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935) (per curiam). In addition to *Mooney,* plaintiff cites *Frank v. Mangum,* 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1914), *Moore v. Dempsey,* 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923), and *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), in support of her argument.

*Mooney, supra,* was decided while the Hauptmann trial was in progress. The petitioner in *Mooney,* convicted of murder and sentenced to life imprisonment, sought leave to file a petition for habeas corpus relief in the Supreme Court. He charged that his confinement violated the due process clause because he had been convicted solely on the basis of perjured testimony (knowingly used by the prosecutor) and because the prosecutor deliberately suppressed exculpatory evidence. The Supreme Court held that, if the petitioner's allegations were true, his conviction and imprisonment would violate the due process clause of the fourteenth amendment. The court denied leave to file a petition for a writ of habeas corpus, however, because of the petitioner's failure to exhaust state remedies.

*Frank, supra,* was an appeal from a denial of a petition for the writ of habeas corpus. The appellant, convicted of murder, alleged that he had been denied a fair and impartial trial because, among other reasons, "disorder in and about the courtroom during the trial and up to and at the reception of the verdict resulted in mob domination." 237 U.S. at 324, 35 S.Ct. at 586. The Court stated, "[I]f a trial is in fact dominated by a mob, so that the jury is intimidated and the trial judge yields, and so that there is an actual interference with the course of justice, there is, in that court, a departure from due process of law in the proper sense of the term." *Id.* at 335, 35 S.Ct. at 590. The court affirmed the denial of the writ of habeas corpus, however, on the basis of the state supreme court's determination that the alleged disorder had consisted only of two minor irregularities which did not prejudice the accused.

*Moore v. Dempsey, supra,* similarly came before the Court on appeal from a dismissal of a habeas corpus petition. The appellants, five black men, had been convicted of murdering a white man and had been sentenced to death. They claimed that they had been denied due process because their trial had been dominated by a mob; their appointed counsel had not consulted with them before trial, failed to challenge the jury, called no witnesses, and did not put the defendants on the stand; and the entire trial had lasted only 45 minutes, with the jury verdict coming five minutes later. The Court, following *Frank,* held that "if the case is that the whole proceeding is a mask—that counsel, jury and judge were swept to the fatal end by an irresistible wave of public passion, and that the State Courts failed to correct the wrong," due process would have been violated. 261 U.S. at 91, 43 S.Ct. at 266. The court remanded the case with instructions to the district court to consider the habeas corpus petition.

*Powell v. Alabama, supra,* is similar to both *Frank* and *Moore.* *Powell* was a direct appeal by four young black men who were convicted and sentenced to death for the rape of two young white women, in the famous Scottsboro case. The trial "took place in an atmosphere of tense, hostile and excited public sentiment." 287 U.S. at 51, 53 S.Ct. at 57. The defendants were ignorant, illiterate residents of other states who had neither friends nor family in Alabama. They were not given an opportunity to obtain counsel of their choice; rather, the trial court appointed all the members of the local bar to represent them at their arraignment, and only on the morning of trial was one lawyer designated to represent them. The Supreme Court found that the defendants "were not accorded the right of counsel in any substantial sense," *id.* at 58, 53 S.Ct. at 60, and that the failure of the state either to afford the defendants the opportunity to secure counsel or to make an effective appointment of counsel violated the due process clause of the fourteenth amendment. The holding was limited, however, to the circumstances of the case.

> Whether this would be so in other criminal prosecutions, or under other circumstances, we need not determine. All that is necessary now to decide, as we do decide, is that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case.

*Id.* at 71, 53 S.Ct. at 65.

The cases cited by plaintiff support the proposition that, if Wilentz did in fact obtain Hauptmann's conviction solely through the use of perjured testimony and by withholding exculpatory evidence from the defense, then Hauptmann was denied a fair trial. It must be remembered, however, that neither an appeal from Hauptmann's conviction nor a petition for a writ of habeas corpus is before this court. *See infra* p. 402. Plaintiff has brought a civil suit for damages against Wilentz, under 42 U.S.C. § 1983. As explained above, all of her claims against Wilentz must be dismissed for one reason or another. Under *Imbler,* Wilentz is absolutely immune from suit under § 1983 on the claims that he used false, perjured, or misleading testimony at Hauptmann's trial and that he concealed exculpatory evidence. The claims based on his alleged authorization of illegal wiretapping and eavesdropping must be denied, some because plaintiff failed to plead with specificity, and others because Wilentz is entitled to immunity under *Harlow.* The claims of "burglary" of a defense investigator's luggage, interception of correspondence, jury contamination, failure to supervise police, creation of an atmosphere of lawlessness within the police force, conspiracy with Hearst, and conspiracy to use anti-German prejudice, are dismissed as to Wilentz for failure to plead with specificity. The claims based on Wilentz's alleged withholding of personal property, infliction of cruel and unusual punishment, and making inflammatory statements to the press are dismissed with prejudice because they are time-barred. The claim that Wilentz coerced Kloeppenburg is dismissed with prejudice for failure to allege injury. Since none of plaintiff's claims against Wilentz survives the motion to dismiss, her due process claim based on the sum total of all alleged violations of Hauptmann's rights cannot survive either. The whole cannot be greater than the sum of its parts. Plaintiff's due process claim against Wilentz must also be dismissed.

■ For the reasons stated above, all of the federal claims against defendant Wilentz are dismissed. Plaintiff has also asserted pendent state claims against Wilentz.

Since the federal claims are dismissed, the state's claims are dismissed as well.[28]

## II. Hearst Corporation Motions

We now turn to Hearst Corporation's (Hearst) motion to dismiss the complaint for failure to state a claim upon which relief can be granted.

### A. Section 1983 Claim

Plaintiff, alleging that Hearst deprived her and her husband, Richard Hauptmann, of an array of constitutional rights, seeks damages under 42 U.S.C. § 1983. Hearst moves to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

▮ To state a cause of action under § 1983, plaintiff must show that some person acting under color of state law deprived him of a federally secured right. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Hearst contends that plaintiff here fails to satisfy the "color of state law" requirement. We agree.

▮ The complaint alleges that Hearst acted under color of state law in that it conspired with Edward J. Reilly, chief defense counsel, David T. Wilentz, then Attorney General and lead prosecuting attorney, and other state officials to deprive plaintiff and Richard Hauptmann of vari-

ous constitutional rights. Amended Complaint ¶¶ 53–56; Second Amended Complaint ¶¶ 60–11, 60–13. Private persons who willfully participate in joint action with state officials can be acting "under color of law." *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Black v. Bayer,* 672 F.2d 309, 320 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982).[29] This is true even when the state official is immune from civil liability. *Dennis v. Sparks, supra,* 449 U.S. at 27, 101 S.Ct. at 186.

▮ A conspiracy involving private persons with state officials therefore may satisfy the color of state law as to those private persons. It is not enough, however, to make merely broad or conclusory allegations concerning the existence of such a conspiracy. *Glaros v. Perse,* 628 F.2d 679, 684–85 (1st Cir.1980); *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Kurzawa v. Mueller,* 545 F.Supp. 1254, 1262 (E.D.Mich. 1982). This precept applies with special force in the Third Circuit. As has been noted, in this circuit plaintiffs are required to plead facts with specificity in § 1983 cases. *United States v. City of Philadelphia, supra; Rotolo v. Borough of Charleroi supra; Negrich v. Hohn,* 379 F.2d 213, 215 (3d Cir.1979).[30] Thus, vague and conclusory allegations in civil rights complaints will not survive a motion to dismiss. *United*

---

**28.** If all of the federal claims are dismissed before trial, the court may dismiss the pendent state claims as well. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Broderick v. Associated Hosp. Serv. of Philadelphia,* 536 F.2d 1, 8 n. 25 (3d Cir.1976); 13 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3567 at 451–53 (1975).

**29.** "Joint activity," thus, is one of the means by which action by private parties may be "fairly attributable to the state." *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). Erstwhile private action may also be attributed to the state when: 1) the state and the private party maintain a "symbiotic" relationship, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Braden v. University of Pittsburgh,* 552 F.2d 948, 957 (3d Cir.1977) (en banc); 2) there is a "close nexus" between the

state and the challenged action of the private party, *Jackson v. Metropolitan Edison Company,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); or 3) a private entity exercises a traditionally state function, *Shelly v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

Plaintiff does not rely on any of these other theories, and their inapplicability to Hearst is evident.

**30.** The purpose of requiring greater specificity than is usually the case under the liberal federal pleading rules is to ensure that civil rights actions are not frivolously brought and to enable the court to assess whether the action may be meritorious. *See United States v. City of Philadelphia, supra,* 644 F.2d at 204 (quoting *Valley v. Maule,* 297 F.Supp. 958, 960–61 (D.Conn.1968)).

*States v. City of Philadelphia, supra,* 644 F.2d at 204; *Hall v. Pennsylvania State Police,* 570 F.2d 86, 89 (3d Cir.1970); *see Mokone v. Fenton, supra,* at 1002 n. 12. These specificity of pleading rules fully apply to allegations that private parties conspired with state officials. *See, e.g., Chicarelli v. Plymouth Garden Apartments,* 551 F.Supp. 532, 539–40 (E.D.Pa.1982); *Celano v. Celano,* 537 F.Supp. 690, 694–97 (E.D.Pa. 1982).

Agreement to commit an unlawful act lies at the heart of civil conspiracy. *Ammlung v. City of Chester, supra,* 494 F.2d at 814; *accord Hampton v. Hanrahan, supra,* 600 F.2d at 620–21. To survive a motion to dismiss, plaintiff must allege with sufficient factual particularity that the private party and a state actor reached some explicit or tacit understanding or agreement to deprive plaintiff of a federal right. *Hampton, supra,* 600 F.2d at 621; *Slotnick v. Staviskey,* 560 F.2d 31 (1st Cir.1977), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978); *Celano v. Celano, supra,* 537 F.Supp. at 694. Circumstantial evidence may provide adequate proof of conspiracy. *Hampton, supra,* 600 F.2d at 621. It is not enough, however, to show that the private and state actors might have had a common goal unless there is a factually specific allegation that they directed themselves toward an unconstitutional act by virtue of a mutual understanding or agreement. *Tarkowski v. Bartlett Realty,* 644 F.2d 1204, 1206 (7th Cir.1980); *Chicarelli, supra,* 551 F.Supp. at 539.

Plaintiff's numerous allegations of conspiracy are not pleaded with sufficient specificity to support the claim that Hearst acted under color of state law.

We turn first to plaintiff's allegations that Hearst conspired with Reilly, chief defense attorney, and various state officials, including Wilentz, to deprive Richard Hauptmann of his constitutional rights, including the rights to effective assistance of counsel, due process, equal protection and the right to a fair trial. Amended Complaint ¶¶ 53, 54; Second Amended Complaint ¶ 60–13; Fourth Amended Complaint

¶ 7. To support these claims, plaintiff makes a number of allegations with regard to Reilly and Hearst. Amended Complaint ¶¶ 23, 25; Fourth Amended Complaint ¶¶ 3, 4, 9.

Plaintiff asserts that Hearst retained Reilly as counsel for Hauptmann and thereby "secured an exclusive right to all interviews with Mrs. Hauptmann." Amended Complaint ¶ 23. By this arrangement, plaintiff alleges, "Hearst had direct access and a 'pipe line' to the Plaintiff and her husband." *Id.* Thus, "for all intents and purposes the confidentiality of the attorney-client relationship did not exist." *Id.* Due to his relationship with Hearst, Reilly "enjoyed a conflict of interest to the extreme detriment of the accused." *Id.*

Moreover, plaintiff alleges, unknown to Hauptmann, Reilly "had become a heavy drinker." *Id.* ¶ 25. Reilly did not prepare properly for trial, and his performance at trial was most prejudicial to his client, according to plaintiff. *Id.* In particular, Reilly stipulated that the remains of the body discovered were those of the Lindbergh child. *Id.*

The gist of these allegations is that, unknown to Hauptmann, Hearst and Reilly wanted Hauptmann convicted and conspired to deny him his right to effective assistance of counsel, due process, and a fair trial. *Id.*

It is well established that an attorney representing a client does not act under color of state law by virtue of being an officer of the court. *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Black v. Bayer, supra,* 672 F.2d at 317; *Henderson v. Fisher,* 631 F.2d 1115, 1119 (3d Cir.1980) (per curiam). By itself, therefore, any conspiracy between Hearst and Reilly, even assuming one could be inferred, would not satisfy the § 1983 color of state law requirement as to defendant Hearst.

Plaintiff claims that the alleged Hearst-Reilly conspiracy also involved state officials. Amended Complaint ¶¶ 53, 54; Second Amended Complaint ¶ 60–13;

Fourth Amended Complaint ¶¶ 4, 5, 9. Plaintiff, however, pleads no facts in support of this allegation. Plaintiff does not allege that state officials were involved in Hearst's decision to retain Reilly, or indicate when or how state officials were implicated in the Hearst-Reilly relationship.

Moreover, plaintiff's own pleadings are inconsistent with the conspiracy allegation. Plaintiff alleges that a number of state defendants, including Wilentz, conspired to eavesdrop on conversations between Hauptmann and his attorneys, including Reilly. Third Amended Complaint ¶ 33–12; Second Amended Complaint ¶ 33–2. The state defendants "were privy thereby to a confidential attorney-client communications [sic]," Third Amended Complaint ¶ 33–12; "at no time was the accused, his counsel or others affiliated with the defense apprised of the eavesdropping." Second Amended Complaint ¶ 33–2. The very state officials with whom Hearst and Reilly supposedly were conspiring, that is, were themselves allegedly conspiring to spy on Reilly without telling him, hardly consistent with any claim of conspiracy between Hearst, Reilly and state officials.

Furthermore, the pleadings are conclusory as to any conspiracy between Hearst and Reilly. Plaintiff alleges the conspiracy involved a breach of the attorney-client relationship, yet does not identify any instances in which confidential information was re-vealed to, or published by, Hearst. Plaintiff also alleges Reilly rendered ineffective assistance as counsel, yet it is not alleged that Hearst knew of or somehow encouraged such ineffective assistance. Moreover, plaintiff's own pleadings reveal that Richard Hauptmann had three other trial counsel. Third Amended Complaint ¶ 33–12. Plaintiff does not challenge their competence or allege that they were part of any conspiracy.[31]

■ Plaintiff also alleges that Hearst conspired with various state officials in matters not directly related to Reilly.[32] Plaintiff alleges that prior to, and during, the trial Hearst, in conspiracy with Wilentz and others, published "highly inflamatory [sic]" newspaper articles conveying to the public Hearst's belief that Hauptmann was guilty of the kidnapping and murder. Amended Complaint ¶¶ 22–24. This created an "hysterical atmosphere" that deprived Hauptmann of his right to a fair trial and due process of law. *Id.* ¶¶ 22, 24, 54; Fourth Amended Complaint ¶ 8. Putting aside first amendment concerns, raised by such a claim, although the complaint quotes freely from stories in various Hearst newspapers, Amended Complaint ¶ 22, it does not indicate the nature of the ostensible conspiracy between Hearst and Wilentz. Plaintiff does not allege that Wilentz (or any other state official) urged Hearst to publish articles, that Wilentz and Hearst

---

**31.** The court having had the benefit of reading the transcript of the Hauptmann trial, it is well to note that other counsel, for example, Frederick Pope, handled questioning, objections, and arguments. As noted, plaintiff has not challenged the ability of these counsel who worked on the case with Reilly. Plaintiff points to Reilly's conceding the identity of the body as evidence of his incompetence and participation in a conspiracy to deprive Hauptmann of due process and sixth amendment rights. Charles Lindbergh, however, identified the body as his son, and the body was found wearing the remains of the homemade flannel shirt that the Lindbergh baby was wearing on the night of the kidnapping. It is preposterous for this court, almost fifty years later, to evaluate trial decisions of Reilly and his co-counsel on this matter, or any other, when we do not know what information he did or did not have, or what the tactical situation was.

These observations obviously go beyond the pleadings and do not form the basis for resolving Hearst's motion. They do, however, reflect the lack of merit to plaintiff's claims.

**32.** Indeed, plaintiff can be taken to allege that the Hearst-Reilly relationship is merely one aspect of an ongoing conspiracy between Hearst and the state defendants. *See* Fourth Amended Complaint ¶ 9. The absence of any direct connection between the state defendants and the Hearst-Reilly relationship is, in this context, arguably not critical.

For this generalized conspiracy to satisfy the "color of state law" requirement, though, the complaint must allege with the requisite specificity that there was in fact some sort of conspiracy between Hearst and the state defendants. For the reasons set forth *infra*, we find that the complaint fails to do this.

agreed to create a prejudicial atmosphere, or that Wilentz improperly supplied Hearst with information regarding the case. Moreover, the complaint does not recite any facts from which some such joint activity could be inferred.

■ Plaintiff does allege that Adela Rogers St. Johns, a Hearst reporter who covered the trial, "provided assistance and inspiration to the prosecution." Fourth Amended Complaint ¶ 4. Plaintiff does not specify what form this "assistance" took. This bare allegation of "assistance" does not save plaintiff's conspiracy allegation from being mere conclusion.[33]

■ Indeed, as plaintiff's reference to the "inspiration" provided by St. Johns suggests, the complaint, at most, identifies a situation in which both the prosecution team and Hearst wished to see Hauptmann convicted. That a private party independently pursues activity directed to a goal shared by a state actor, however, does not mean the private party is engaged in concerted activity with state officials. *See Tarkowski, supra,* 644 F.2d at 1206; *Chicarelli, supra,* 551 F.Supp. at 539.

■ Finally, plaintiff alleges that Hearst and Wilentz conspired to intimidate a defense witness, Kloeppenburg, in violation of Hauptmann's right to due process of law. · Amended Complaint ¶ 29; Second Amended Complaint ¶ 60–13. The complaint quotes Kloeppenburg, without indicating the source of the statement, to the effect that Wilentz had threatened him in an effort to prevent him from testifying

that he had seen Isidore Fisch enter Hauptmann's house with a shoe box, which later turned out to contain the ransom money. Amended Complaint ¶ 29. Hearst allegedly was involved because, according to Kloeppenburg, " 'The reporters for the New York Journal took me to see Wilentz . . . . Then they left me and Wilentz alone for a private talk.' " *Id.* The deficiency in the allegation as to Hearst is patent. There is no allegation that the reporters knew what Wilentz would do, or that they reached an understanding with Wilentz with regard to attempting to intimidate Kloeppenburg, nor can such an inference reasonably be drawn. Again, the allegation of conspiracy is merely conclusory. Furthermore, as has been earlier noted, *supra* p. 378, plaintiff's complaint belies the notion that Wilentz's behavior, assuming it occurred, deprived Hauptmann of any constitutional rights. Kloeppenburg reported that he did in fact testify as to what he saw: he described the size and measurements of the box, but simply did not call it a shoe box. *Id.*

In sum, measuring the allegations in plaintiff's complaint against the requirement of specificity of pleading in civil rights cases, *see United States v. City of Philadelphia, supra,* 644 F.2d at 204; *Rotolo, supra,* 532 F.2d at 922, they are insufficient to state a claim. Aside from the vague and conclusory conclusions of conspiracy, plaintiff has not alleged that Hearst acted under color of state law. Accordingly, plaintiff's § 1983 action against Hearst must be dismissed pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim.

---

**33.** Hearst's 12(b)(6) motion tests the sufficiency of the complaint. Nevertheless, it is well to note that plaintiff points to two telegrams as evidence of Adela St. Johns' "assistance" to the prosecution and, thereby, of conspiracy.

On February 14, 1935, the day following Hauptmann's conviction, Ms. St. Johns sent a telegram to Wilentz thanking him for obtaining the just and necessary verdict. Plaintiff's Supplemental Memorandum, at 14a. In a responding telegram Wilentz wrote:

No words within my command can express my deep appreciation for the help which you rendered the prosecution and for the inspiration which you gave me. Stop. Among all the telegrams which I received this morning

yours was the most beautiful and moved me the most. You have my everlasting thanks. *Id.* at 15a.

Assuming these telegrams are authentic, they hardly sustain an allegation of conspiracy. The most they reasonably suggest is that St. Johns' articles were favorable to the prosecution's view of the case and that Wilentz appreciated such "help" from the press.

In addition, there is no basis for finding that any adverse publicity deprived Hauptmann of his constitutional rights. As to pre-trial publicity, the jury was voir dired. As to publicity during the trial, the jury was sequestered. Moreover, the question of pre-trial publicity was an issue on appeal.

The dismissal is without prejudice; plaintiff will be given the opportunity to move to amend the complaint to plead facts with specificity. *See Ross v. Meagan, supra,* 638 F.2d at 640.[34]

### B. Sections 1985(3) & 1986 Claims

Plaintiff also claims that Hearst conspired with Reilly, Wilentz, and members of the New Jersey State Police to deprive Richard Hauptmann, a German immigrant, of equal protection of the laws in violation of 42 U.S.C. §§ 1985(3) & 1986. Amended Complaint ¶ 55; Second Amended Complaint ¶ 60–14. Hearst also moves to dismiss these claims under Fed.R.Civ.P. 12(b)(6).

■ Section 1985(3) provides a damages remedy against any one conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ...." 42 U.S.C. § 1985(3). This section reaches some purely private conspiracies. *Griffin v. Breckenridge, supra,* 403 U.S. at 91, 91 S.Ct. at 1793.[35] Section 1985(3) creates no substantive rights itself, but merely provides a remedy for violations of the rights it designates. *Great American Federal Savings & Loan Assoc. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

■ A § 1985(3) conspiracy claim must be pleaded with factual specificity. *Robinson v. McCorkle, supra,* 462 F.2d at 113; *Martinez v. Winner,* 548 F.Supp. 278, 327 (D.Colo.1982). As already stated, the pleadings contain mere conclusory allegations of conspiracies between Hearst and Reilly, and Hearst and various state officials. Hearst's motion to dismiss the § 1985(3) claim must be granted.

■ Further, when the alleged conspiracy is aimed at interfering with rights that are by definition rights only against state interference, as fourteenth amendment rights are, the plaintiff in a § 1985(3) suit must establish that the conspiracy contemplated state involvement. *United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott,* —— U.S. ——, ——, 103 S.Ct. 3352, 3357, 77 L.Ed.2d 1049 (1983).[36]

■ Even beyond this, § 1985(3) provides a remedy only if there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin, supra,* 403 U.S. at 102, 91 S.Ct. at 1798. Plaintiff alleges that the defendants' conspiracy against Hauptmann was motivated by his being of German origin. Second Amended Complaint ¶¶ 33–8, 60–14.

The Supreme Court has not clearly explicated what classes, other than racial ones, might be protected by § 1985(3). *See United Brotherhood of Carpenters & Joiners, etc., supra,* —— U.S. at ——, 103 S.Ct. at 3359; *Griffin, supra,* 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9. The Third Circuit, among others, has held that classes distinguished by gender fall within the statute. *See Novotny v. Great American Federal Savings & Loan Assoc.,* 584 F.2d 1235, 1243 (3d Cir.1978) (en banc), *rev'd on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Life Insurance Co. of North America v. Reichardt,* 591 F.2d 499 (9th Cir.1979). Like racial animus, sexual animus is "based upon 'immutable characteristics' for which the members of the class have no responsibility." *Carchman v. Kor-*

---

**34.** As has been stated, with respect to any future amendment of the complaint, the defendant Hearst here will be given an opportunity to discover the source of information relied upon in making such an amendment. *Cf.* Fed. R.Civ.P. 11. *See supra* p. 373.

**35.** It is assumed for these purposes that *Griffin* applies retroactively. If it does not, the § 1985(3) claim would have to be dismissed for failure to allege state action.

**36.** In *United Brotherhood of Carpenters and Joiners, etc.,* the Supreme Court read *Griffin v. Breckenridge, supra,* which held that § 1985(3) reaches purely private conspiracies, as meaning that § 1985(3) reaches only those private conspiracies aimed at interfering with rights that themselves are constitutionally protected against private as well as official encroachment, for example, thirteenth amendment rights. —— U.S. at ——, 103 S.Ct. at 3357.

*man Corp.,* 594 F.2d 354, 356 (3d Cir.) (construing *Novotny* ), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979). Like blacks, women have been the victim of "historically pervasive discrimination." *Id.*

■ It has been suggested that a class based on national origin is sufficiently invidious for § 1985(3) purposes. *See Arnold v. Tiffany,* 359 F.Supp. 1034, 1036 (C.D. Cal.), *aff'd,* 487 F.2d 216 (9th Cir.), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1973). At least one district court has found that a conspiracy motivated by a class-based animus against persons of Hispanic descent or appearance falls within § 1985(3), although the court did not indicate whether the class was ethnically or racially defined. *See Gomez v. City of West Chicago,* 506 F.Supp. 1241, 1245 (N.D. Ill.1981).[37]

■ Even assuming a class distinguished by national origin, essentially an "immutable characteristic," might in some circumstances fall within § 1985(3), this is not such a case. German immigrants to the United States have not been the victims of "historically pervasive discrimination." Plaintiff portrays Richard Hauptmann as a victim of the anti-German sentiment occasioned by the rise of Nazism. Second Amended Complaint ¶ 33–8. Plaintiff's allegations, however, are not grounded in historical fact. The nature of the Nazi regime, tragically, was not widely known in 1935. The acts of aggression that began to reveal the regime's nature, and then only slowly—the *Anschluss* with Austria, the annexation of the Sudetenland, the war with Poland—occurred long after Hauptmann's execution in 1936. World War II certainly aroused widespread anti-German feeling. Such sentiment, however, did not exist at the time of Hauptmann's trial.

Furthermore, *Griffin* requires that a discriminatory animus be "behind" the conspirators' actions. The conspiracy must be directed at the plaintiff because he belongs to a given class. *See C & K Coal Co. v. United Mine Workers,* 704 F.2d 690, 700 (3d Cir.1983). It must deprive him of equal protection or equal privileges and immunities. If the conspiracy only affects the plaintiff individually, the allegations will not satisfy the class-based animus requirement. *See, e.g., Scott v. Rosenberg,* 702 F.2d 1263, 1270 (9th Cir.1983); *Weiss v. Patrick,* 453 F.Supp. 717, 724 (D.R.I.), *aff'd mem.,* 588 F.2d 818 (1st Cir.1978); *Stern v. Massachusetts Indemnity and Life Insurance Co.,* 365 F.Supp. 433, 443 (E.D.Pa. 1973). Even assuming anti-German sentiments were prevalent in 1935, plaintiff's complaint does not plead facts that support the allegation that Hearst and others conspired against Richard Hauptmann, assuming they did, because of his German heritage, rather than because he was found with the ransom money, or because they needed a scapegoat, or for some other reason. Thus, the complaint would also have to be dismissed on this ground.

Hearst's motion to dismiss the § 1985(3) claims is granted.

■ We now turn to 42 U.S.C. § 1986. This statute is a companion to § 1985, and

---

**37.** In *Keating v. Carey,* 706 F.2d 377 (2d Cir. 1983), the Second Circuit found that in enacting § 1985(3) Congress did not intend to protect only blacks and analogously oppressed minorities but also to prevent discrimination on the basis of political affiliation. Accordingly, the court held that members of the Republican Party are a protected class within the meaning of the statute. *Id.* at 386–88. *See also Taylor v. Gilmartin,* 686 F.2d 1346, 1355–58 (10th Cir. 1982) (conspiracy based on religious affiliation is within § 1985(3), *cert. denied,* —— U.S. ——, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983).

Even if this reading of § 1983 is correct, *cf. United Brotherhood of Carpenters & Joiners, etc., supra* (expressing doubt that § 1985(3) reaches nonracial, politically motivated conspiracies); *C & K Coal Co. v. United Mine Workers,* 704 F.2d 690, 700 (3d Cir.1983) (whether § 1985(3) protects against political conspiracies is open to question), it is of no help to the plaintiff in this case. Plaintiff alleges discrimination on the basis not of political affiliation but of national origin. Under these circumstances, the class to which plaintiff belongs would have to be the victim of "historically pervasive discrimination" to be protected by § 1985(3). *See id.* at 700; *Carchman v. Korman Corp.,* 594 F.2d 354, 356 (3d Cir.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979).

provides a remedy for misprision of a § 1985(3) conspiracy. Plaintiff's failure to state a claim under § 1985(3) necessarily causes the § 1986 claim to fail. *See Rogin v. Bensalem Township,* 616 F.2d 680, 697 (3d Cir.1980); *Lyon v. Temple University,* 507 F.Supp. 471, 479 (E.D.Pa.1981). Hearst's motion to dismiss the § 1986 claim is granted.

Since no federal claims against Hearst survive, any pendent state claims against Hearst will also be dismissed.

In view of this disposition, it is unnecessary to reach Hearst's alternative grounds for dismissal.

### III. Thomas H. Sisk's Motions

#### A. Section 1983 Claim

Plaintiff, alleging that defendant Thomas Sisk deprived her and Richard Hauptmann of constitutional rights, seeks damages under 42 U.S.C. § 1983. Sisk moves to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed.R. Civ.P. 12(b)(6).

■■■ Plaintiff alleges that Sisk acted at all times in his capacity as a law enforcement officer as an agent of the Federal Bureau of Investigation. Second Amended Complaint ¶ 15–3. Actions by federal agents under color of federal law do not give rise to § 1983 liability. *Stonecipher v. Bray,* 653 F.2d 398, 401 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); *Bethea v. Reid,* 445 F.2d 1163, 1164 (3d Cir.1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972). Like private persons, however, *see Dennis v. Sparks, supra,* 449 U.S. at 27–28, 101 S.Ct. at 186, federal officials who conspire with state officials may be found to be acting under color of state law and thus subject to § 1983 liability. *Hampton v. Hanrahan, supra,* 600 F.2d at 623; *Kletschka v. Driver,* 411 F.2d 436, 448–49 (2d Cir. 1969).

Plaintiff alleges that Sisk conspired with Wilentz and other state officials to deprive her and Richard Hauptmann of various constitutional rights. Sisk contends that plaintiff's conspiracy allegations lack the requisite factual specificity, that plaintiff thereby fails to allege action under color of state law, and, accordingly, that the § 1983 claim must be dismissed. The court agrees. It is also clear that any claims based on Sisk's independent activity must be dismissed as well.[38]

Plaintiff alleges that Sisk conspired with Wilentz, Lewis Bornmann, and other state officials to deprive Hauptmann of his constitutional rights, including the rights to due process, equal protection, effective assistance of counsel, and freedom from cruel and unusual punishment. Second Amended Complaint ¶¶ 60–3, 60–6, 60–7, 60–9, 60–11, 60–15, 60–16; Fourth Amended Complaint ¶ 2. To support these claims, plaintiff makes a number of allegations with regard to Sisk and the state defendants. Second Amended Complaint ¶¶ 33–4 to 33–7.

■■■ Before considering the individual claims, two general observations are in order. First, the allegations against Sisk emerge from a context in which different law enforcement agencies were engaged in parallel investigations of the same crime. In a setting in which state and federal actors are, presumably, pursuing a common goal, the requirement that plaintiff plead specific facts to support allegations that these actors mutually agreed to deprive plaintiff of his civil rights is especially apposite. *See Hampton v. Hanrahan, supra,* 600 F.2d at 621; *Tarkowski v. Bartlett, supra,* 644 F.2d at 1206.

■■■ Second, and going more directly to the substance of defendant's motion, plaintiff's own pleadings are inconsistent with her conspiracy allegations. Plaintiff alleges that "for over 2–½ years the New Jersey authorities continued to investigate [the Lindbergh abduction] but would not cooperate with other investigative agencies such

---

**38.** The discussion of Fed.R.Civ.P. 12(b)(6), 42 U.S.C. § 1983, conspiracy, and civil rights pleading requirements hereinabove set forth is equally applicable here and will not be repeated.

as the Federal Bureau of Investigation (FBI)." Amended Complaint ¶ 17. Plaintiff also alleges that the New Jersey authorities denied federal officials access to copies of the ransom notes and quotes a memorandum allegedly written by J. Edgar Hoover, FBI Director, indicating that New Jersey officials were unwilling to reveal to the FBI the physical evidence that they (the New Jersey officials) possessed until after the case was solved. *Id.* Plaintiff alleges further that during the investigation members of the New Jersey State Police made "numerous statements indicating their negative attitude regarding cooperating with the FBI," and quotes at length from another memorandum to that effect. *Id.* These allegations undercut plaintiff's claim of joint activity between the FBI agent Sisk and state officials.

More particularly, plaintiff alleges that there was a conspiracy to conceal from the defense that merchants who received gold certificates from the ransom money were unable to identify Hauptmann as the individual who passed the bills. Amended Complaint ¶ 33–4. "The cover-up involved a conspiracy among members of the New Jersey State Police, the FBI, and the prosecution, including ... Sisk." *Id.*

The allegation that Sisk conspired with the state defendants is mere conclusion. Plaintiff does not in any way indicate what Sisk did and when. Plaintiff specifically alleges that the New Jersey State Police alone interviewed the merchants, *id.;* she does not allege that Sisk knew these interviews occurred. Plaintiff alleges that the interviews took place approximately three months prior to trial. *Id.* The trial took place in January 1935, so the interviews allegedly took place in October 1934. In her First Amended Complaint, plaintiff cites a memorandum to J. Edgar Hoover, dated October 28, 1934, that states in part:

The cooperation afforded by the New Jersey State Police has been no better since the arrest (of Hauptmann) than it

was before the arrest, and they still follow their old policy of not divulging anything which is of any importance or of value.

Amended Complaint ¶ 17. Plaintiff's own pleadings imply that Sisk did not know of the interviews and thus vitiate the allegation that he conspired to conceal them. At the very least, they cannot be said to support the broad conspiracy allegation.[39]

■ Plaintiff next alleges that Lewis Bornmann wiretapped the telephone of a defense investigator "in a conspiracy involving the defendants Wilentz ... and Sisk." Second Amended Complaint ¶ 33–4(2). Bornmann also allegedly "burglarized" the luggage of a defense investigator "in a conspiracy with the defendants Wilentz ... and Sisk." *Id.* ¶ 33–5.

As was true with respect to the defendant Wilentz, *see supra* p. 375, these allegations are mere conclusion. Plaintiff does not establish any nexus between the alleged wiretapping and "burglary" and Sisk. She does not plead any facts to support the conclusion that Sisk had agreed that Bornmann (or anyone else) should engage in the named activity.

■ Plaintiff's principal allegation is that:

During the trial, the defendant Thomas H. Sisk individually and in a conspiracy with others ... knowingly presented and allowed to be presented perjured, false and misleading evidence, and deliberately withheld from the trial court, jury, and defense evidence relevant to the innocence of plaintiff's decedent, Richard Hauptmann.

Second Amended Complaint ¶ 33–6. Plaintiff also recites a long list of allegedly exculpatory evidence that Sisk supposedly suppressed. *Id.;* Third Amended Complaint ¶ 33–10.

Plaintiff's allegation that Sisk himself committed perjury lacks the requisite speci-

---

**39.** Whether this evidence is exculpatory, as plaintiff alleges, is open to doubt. A particular gold certificate, obviously, may have been passed several times before it was discovered to be a ransom bill. An innocent person, thus, might easily have been the presenter of the bill.

ficity. The complaint does not identify any of Sisk's allegedly false testimony.

More significantly, even assuming the pleadings were sufficient to support the contention that Sisk testified falsely, Sisk is absolutely immune from damages liability. Public officials who testify falsely at trial are absolutely immune from civil rights damages actions. *Briscoe v. LaHue, supra.* Accordingly, the claim that Sisk testified falsely is dismissed, with prejudice.

■ As to the allegation that Sisk, alone and in conspiracy with others, withheld exculpatory information and permitted false testimony to be introduced, plaintiff again fails to plead specific facts to support her allegation. Not only does she fail to allege that Sisk did not reveal to the state prosecutor the information he obtained in the course of his investigations, she alleges that "The Federal Bureau of Investigation in 1934, prior to the trial, submitted to the defendant David T. Wilentz ... 'copies of all the Bureau's reports, papers, and *all information pertinent to the Lindbergh case.*'" Amended Complaint ¶ 27 (emphasis supplied). She also alleges that prior to trial "all relevant FBI documentation and material including that discrediting prosecution witnesses was in the possession of defendant Wilentz...." *Id.*

■ The gravamen of plaintiff's complaint is that exculpatory evidence was not disclosed to the defense prior to or at trial. Assuming *arguendo* that the basic legal principles expounded in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were law in 1935,[40] the complaint lacks any factual allegations to support the conclusion that Sisk himself violated them.[41] *Brady* sets forth the prosecution's constitutional duty to disclose exculpatory information to the defense. This duty of disclosure falls on the state as a whole, not just the prosecutor. *Martinez v. Wainwright,* 621 F.2d 184, 186–87 (5th Cir.1980) (state prosecutor unaware of FBI rap sheet in possession of medical examiner; *Brady* violation found); *United States v. Bryant,* 439 F.2d 642, 650 (D.C.Cir.1971); *Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 846 (4th Cir.1964). A constitutional violation may occur when there is no *Brady* disclosure because the police have concealed exculpatory evidence from the state prosecutor. *Id.* at 846. The police therefore are under a duty to disclose exculpatory information to the prosecutor. *See id.*

■ As noted, nothing in the complaint suggests that Sisk withheld exculpatory information from Wilentz.[42] We are aware of no authority for the proposition that an FBI investigator has an independent duty under *Brady* to disclose information to defense counsel, or to correct the courtroom testimony offered by other witnesses at trial. *Cf. Imbler v. Pachtman, supra* (identifying these as prosecutorial functions). Plaintiff's complaint thus fails to allege that Sisk's independent activity violated the Constitution.[43]

---

**40.** *Brady,* plaintiff contends, was foreshadowed by *Mooney v. Holohan, supra. Shuler v. Wainwright,* 491 F.2d 1213, 1220 n. 22 (5th Cir. 1974); *see also supra* pp. 379–380. Mooney was decided on January 21, 1935, approximately midway between the start of the Hauptmann trial on January 2, 1935, and its completion on February 13, 1935. In view of our disposition of plaintiff's allegations with regard to Sisk, it is unnecessary to determine the impact, if any, of *Mooney* upon the issues here raised, whether *Mooney* required the equivalent of a *Brady* "request" for exculpatory material, and whether such a request was made by the plaintiff's decedent.

**41.** Any independent action by Sisk would not be "under color of state law," and, thus, would not provide a basis for § 1983 liability. To the extent that plaintiff's complaint can be understood to bring a claim directly under the Constitution, however, Sisk's independent activity arguably could be actionable. *But see infra* n. 43.

**42.** We need not now decide whether an FBI agent in fact is under a duty to disclose exculpatory information to a state prosecutor. Similarly, we need not decide whether *Brady* requires that we impute the FBI's knowledge of exculpatory information to a state prosecutor. In this case, the complaint itself alleges that the FBI turned over the evidence to Wilentz.

**43.** Thus, to the extent that plaintiff can be understood to maintain an action against Sisk directly under the Constitution based on his independent activity, plaintiff fails to state a

Plaintiff's allegations that Sisk conspired with Wilentz, and others, to withhold exculpatory evidence are conclusory. Plaintiff pleads no facts to show that Sisk and Wilentz reached an understanding whereby Wilentz would withhold exculpatory evidence from the defense, permit false testimony to go uncorrected, or encourage witnesses to testify falsely. Nor does the complaint recite any facts from which such joint activity could be inferred. Similarly, as already stated, there are no facts to support an allegation that Sisk and Wilentz agreed that Sisk would not divulge exculpatory evidence in his possession to Wilentz. On the contrary, the complaint merely sets forth allegedly exculpatory evidence; it does not implicate Sisk in any alleged suppression.

■ Finally, plaintiff alleges that Sisk conspired with members of the New Jersey State Police in their alleged beating of Richard Hauptmann in the course of interrogating him subsequent to his arrest. Second Amended Complaint ¶¶ 33–7, 60–6. She also contends that Sisk conspired with Wilentz, Joseph Lanigan, then Assistant Attorney General of New Jersey, and others to withhold the fact that the alleged beating occurred.

Plaintiff pleads no facts that would implicate Sisk in a conspiracy involving the beatings. The complaint does not provide any indication of an agreement between Sisk and the police officers whereby the officers would beat Hauptmann during interrogation. Plaintiff alleges that Sisk was aware of the beatings but "did not intervene" to protect Hauptmann, and that Sisk "encouraged" the beatings through "his silence and nonfeasance." Second Amended Complaint ¶ 33–7. Plaintiff does not allege that Sisk was present when the beatings occurred. Indeed, plaintiff does not indicate when Sisk became aware of the beatings. Moreover, Sisk is not alleged to have had supervisory authority over the New Jersey police officers. Sisk's mere knowledge of the alleged beatings, even when coupled with allegations of failure to take any action, is by itself insufficient to plead joint participation in a conspiracy with the New Jersey police. See Peck v. United States, 470 F.Supp. 1003, 1008 (S.D.N.Y.1979).

Further, since Sisk is not alleged to have been present at the beatings or to have had supervisory authority over the state police officers, it is difficult to understand how his alleged "silence and nonfeasance" is causally connected to the beatings for purposes of establishing liability under § 1983. See Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) (acquiescence by supervisor in subordinate's misconduct); Bruner v. Dunaway, 684 F.2d 422 (6th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983) (nonfeasance by police officer present at time of the beating). Moreover, plaintiff's complaint reveals that Sisk did tell Lanigan that Hauptmann had been beaten, see Second Amended Complaint ¶ 33–7, and does not recite facts implying that Sisk and Lanigan (or Wilentz) agreed that this information should be withheld.

In sum, the allegation that Sisk committed perjury must be dismissed with prejudice on grounds of absolute immunity. Briscoe v. LaHue, supra. Any allegation that Sisk independently withheld exculpato-

---

claim against him. Sisk is under no Brady duty independently to disclose exculpatory information to the defense; thus, his failure to do so does not amount to a constitutional violation.

A police officer who hears testimony at trial that he knows to be false, however, arguably is under a duty to correct the testimony by informing the prosecutor that it is untrue. See Luna v. Beto, 395 F.2d 35, 40 (5th Cir.1968). We do not understand plaintiff to allege that Sisk, who attended Hauptmann's trial, heard testimony he knew was false and neglected to inform Wilentz of this fact. Rather, plaintiff alleges that Sisk and Wilentz permitted testimony they both knew to be false to go uncorrected. This amounts to a § 1983 claim of conspiracy under color of state law, not to a claim against Sisk brought directly under the Constitution for his independent wrongdoing.

To the extent that plaintiff does allege that Sisk neglected to inform Wilentz of testimony he knew to be untrue but Wilentz did not, the pleading lacks the requisite specificity. The complaint does not indicate what this testimony was or when Sisk suppressed the information.

ry information is dismissed for failure to state a constitutional violation because he is not a state officer, under 42 U.S.C. ¶ 1983. The conspiracy allegations in the complaint are insufficient when measured against the requirement of specificity of pleading in civil rights cases. *See United States v. Philadelphia, supra,* 644 F.2d at 204; *Rotolo, supra,* 532 F.2d at 922. Accordingly, the complaint is devoid of an allegation that Sisk acted under color of state law. These § 1983 allegations against Sisk must therefore be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

### B. Sections 1985(3) & 1986

Plaintiff also claims that Sisk conspired with various state defendants to deprive Richard Hauptmann of equal protection of the laws in violation of 42 U.S.C. §§ 1985(3) & 1986. Second Amended Complaint ¶¶ 33–8, 60–14.

■ As just indicated, the pleadings contain mere conclusory allegations of conspiracies, and are insufficient to meet the pleading requirements of § 1985(3). *See Robinson v. McCorkle, supra,* 462 F.2d at 113. For the reasons set forth in the discussion of Hearst Corporation's motion to dismiss, the complaint is also deficient for its failure to allege the requisite class-based discriminatory animus.

Accordingly, Sisk's motion to dismiss the § 1985(3) claim, and the companion § 1986 claim, is granted.

To the extent that plaintiff can be understood to be maintaining any other federal claim against Sisk not heretofore discussed, I find the allegations are too vague and conclusory to satisfy the pleading requirements for civil rights cases. *See Rotolo, supra,* 532 F.2d at 922. These claims are dismissed.

Since no federal claims against Sisk remain, any pendent state claims against Sisk also will be dismissed.

In view of this disposition, it is unnecessary to reach Sisk's alternative grounds for dismissal.

### IV. Motions of Lewis J. Bornmann, John B. Wallace, William F. Horn, Joseph A. Wolf and Hugo Stockburger

We now turn to the motions by the individual New Jersey State Police Officers Lewis J. Bornmann, John B. Wallace, William F. Horn, Joseph A. Wolf and Hugo Stockburger (the Officers), for failure to state a claim upon which relief can be granted and, alternatively, for summary judgment. *See* Fed.R.Civ.P. 12(b)(6), 56. For the reasons stated below, these motions to dismiss are granted; thus the motions for summary judgment need not be addressed.

The complaint's allegations against the Officers fall into the following categories: they subjected Hauptmann to "third degree type" interrogations, and beat him; they wrongfully confiscated personal belongings of plaintiff and plaintiff's husband and held them for at least five months; they withheld exculpatory evidence from the defense and court at trial; they withheld evidence on post-conviction appeals of plaintiff's husband; and they committed perjury at trial. Plaintiff also alleges the Officers eavesdropped on Hauptmann and his attorneys, searched the belongings of a defense investigator and wiretapped telephone conversations of a defense investigator. Many of the foregoing allegations are also made against the defendant Wilentz. Even in those instances where a particular defendant is singled out as guilty of a particular allegation, it is also alleged that the wrongful acts were committed in conspiracy with the other defendants.

More specifically, plaintiff alleges that after being arrested, her husband was subjected "to intense 3rd degree type interrogation, in which members of the New Jersey State Police participated .... [H]e was severely beaten and otherwise abused." Amended Complaint ¶ 19. None of the individual defendants is named as a participant in this beating. Plaintiff also claims that the state police defendants, along with Wilentz, "knowingly presented and allowed to be presented perjured, false and misleading evidence and deliberately held from the

trial court, jury and defense evidence verifying the innocence of Richard Hauptmann." *Id.* ¶ 26. Plaintiff states the Officers withheld the following evidence: that Colonel Lindbergh prior to trial had been unable to identify Hauptmann's voice, *id.* ¶ 26(A); that Millard Whited, who identified Hauptmann at trial as someone whom he had seen in the vicinity of the Lindbergh residence in Hopewell, had prior to trial said he could not see anything, *id.* ¶ 26(B); and that Joseph Perrone, who testified that Hauptmann had given him an envelope to deliver to Dr. John F. Condon, gave perjured testimony, *id.* ¶ 26(C). Plaintiff also alleges that "Perrone was corruptly encouraged by law enforcement officials including New Jersey State Police, to identify Richard Hauptmann." *Id.* However, none of the Officers herein is identified as having thus "corruptly encouraged" Perrone; and the "encouragement" as described in the complaint is an allegedly suggestive "one-on-one" lineup in which Hauptmann was required to repeat the words which Perrone stated had been used by the man who gave him the ransom note to deliver to Condon.

Plaintiff also alleges that the Officers withheld the fact that a state police colleague had called Dr. Condon "wacky" and that Condon's testimony was not credible. *Id.* ¶ 26(D). She also claims that the individual defendants withheld information that Albert D. Osborn, the handwriting expert who testified at trial, had earlier stated that the handwriting on the ransom notes was not that of Richard Hauptmann. *Id.* ¶ 26(E). Plaintiff further alleges that the Officers withheld the facts that Amandus Hochmuth, who at trial identified Hauptmann's automobile as having been near the scene at the time of the crime, was blind and that Cecile Barr, who testified that she received a $5 ransom bill from Hauptmann, had chosen Hauptmann pretrial from an impermissibly suggestive lineup. *Id.* ¶¶ 26(H), (I).

Plaintiff also alleges that defendant Bornmann committed perjury in his testimony about his discovery that a rung from the kidnap ladder fit exactly into a section of Hauptmann's attic floor from which a

board had been removed. *Id.* ¶ 26(J). Plaintiff also claims, "the Plaintiff and her child were pressured [she does not state by whom] to vacate her home on September 21, 1934, and the defendant Bornmann became the new tenant through a new lease. Defendant Bornmann and others completely deprived the Plaintiff of her privacy." *Id.*

Plaintiff alleges also that the defendants concealed the fact that the testimony of the "wood expert," Arthur Koehler, was based upon "misleading and non-credible information." *Id.* ¶ 26(K). The Officers are also accused of withholding: evidence concerning latent fingerprints on the ransom money, *id.* ¶ 26(L); "significant observations" made by the FBI; that the New York City police recorded the license plate of every car entering New York from New Jersey the night of the kidnapping and that Hauptmann's car was not among the recorded license plates; that two sets of footprints on the Lindbergh property did not match Hauptmann's footprints; that an FBI memo stated that the ladder used for the kidnapping would not hold a man of Hauptmann's size; that Dr. John F. Condon had stated that the kidnapper had a "growth" on his right thumb; and that Dr. Condon described the voice of the man whom he met in the cemetery with the ransom payment as Scandinavian. *Id.* ¶¶ 26(M)–(R).

The plaintiff also alleges that the Officers, along with defendant Wilentz, "suppressed" work records for the Majestic Apartments for the first half of March, 1932, *id.* ¶ 26(S), and the ledger "big book" of Richard Hauptmann, *id.* ¶ 26(T); and that the New Jersey State Police confiscated personal belongings of the plaintiff and held them until five months after Hauptmann's execution. *Id.* ¶ 28. It is also charged that defendant Wilentz withheld that "he and other law enforcement officials had threatened the witness [Hans Kloeppenburg] prior to his testimony." *Id.* ¶ 29. None of the individual Officers is named as a participant in this threatening of a witness. As a result of these alleged

threats, it is asserted, Kloeppenburg refrained from stating that he had seen Isidore Fisch give Richard Hauptmann a "shoe box." According to the complaint, Kloeppenburg has since said, "So when I testified I never called it a shoe box. I described the size of a shoe box, but I never used that word." *Id.* Finally, plaintiff alleges that since Hauptmann's conviction, "David T. Wilentz and all other defendants named herein, have continuously . . . withheld and concealed facts, material evidence and the truth from the Plaintiff, Anna Hauptmann, and the public." *Id.* ¶ 33.

For all of the aforementioned alleged actions, it is claimed that Hauptmann suffered violations of his constitutional rights in contravention of 42 U.S.C. §§ 1983, 1985 and 1986. *Id.* ¶ 35.

Plaintiff's second amended complaint alleges that Stockburger "and others . . . clandestinely eavesdropped" on Hauptmann in the Hunterdon County Jail, Flemington, New Jersey, and overheard conversations between Hauptmann and his attorneys, defense investigators and the plaintiff. Second Amended Complaint ¶ 33–2. She also alleges that the New Jersey State Police engaged in what plaintiff terms "jury contamination" by approaching "prospective jurors" to solicit their views concerning the Hauptmann trial. *Id.* ¶ 33–3. None of the individual Officers is named as participating in this contamination. The plaintiff alleges that the defendants never revealed to the court or defense counsel that pictures of Hauptmann were shown to recipients of ransom money who could not identify Hauptmann as the man who gave them the ransom money. *Id.* ¶ 33–4(1). This complaint also charges that defendant Bornmann, "in conspiracy with" defendant Wilentz and the other defendant Officers wiretapped the telephone of a defense investigator. *Id.* ¶ 33–4(2). Finally, the plaintiff alleges that "members of the New Jersey State Police" burglarized the luggage of a defense investigator, *id.* ¶ 33–5; and that Bornmann, "individually and in a conspiracy with other members of the New Jersey State Police and the New York Police Department," did "impartially" search the personal effects of a defense investigator. *Id.* ¶ 60–12.

Plaintiff filed a third amended complaint that basically reiterates the accusations against the Officers and specifically accuses defendant Stockburger "in a conspiracy with the defendant David T. Wilentz [and] the other aforementioned defendants, and others," of having eavesdropped and monitored conversations between Hauptmann and his attorneys. Third Amended Complaint ¶ 33–12.

The allegations that the New Jersey State Police defendants conspired to and did beat Hauptmann and wrongfully appropriated plaintiff's and Hauptmann's personal belongings state colorable claims under 42 U.S.C. § 1983. Any legal action for these allegations, however, is barred by the applicable statutes of limitations:

> [T]he rule in the Third Circuit is that "the applicable statute of limitations must be determined from the nature of the conduct involved" . . . . Thus, if a civil rights action arises in the District Court in New Jersey alleging unjustifiable assault by a police officer, the two-year statute governing actions for injuries to the person, N.J.S.A. 2A:14–2, will apply. . . . If . . . wrongful deprivation of property is alleged, the six-year statute will apply.

*Peters v. Township of Hopewell,* 534 F.Supp. 1324, 1335 (D.N.J.1982) (citations omitted). The same rule applies to any actions plaintiff might bring under 42 U.S.C. § 1985 for the same conduct. *See Board of Regents v. Tomanio, supra; Knoll v. Springfield Township School District, supra.* Finally, 42 U.S.C. § 1986 contains its own period of limitations which provides that "no action under the provision of this section shall be sustained which is not commenced in one year after the cause of action has accrued."

Richard Hauptmann was executed in April 1936. Plaintiff offers no explanation why she has delayed bringing this aspect of the instant lawsuit. The defendants' alleged misconduct was by its nature then

and there immediately known to Hauptmann. Moreover, plaintiff does not argue that the statute of limitations should not apply here because she had no knowledge of these allegations until recently. Indeed, any such argument would have to be rejected; the complaint itself quotes Hauptmann on the subject of his alleged mistreatment by the New Jersey State Police. Thus, even assuming plaintiff to have otherwise stated a claim under 42 U.S.C. §§ 1983, 1985 and 1986 for the alleged beating of her husband and wrongful deprivation of property, the motion of the New Jersey State Police defendants must be granted, and this portion of the complaint dismissed because on its face it is barred by the statute of limitations.

■ For the same reason, any claims by plaintiff under 42 U.S.C. §§ 1983, 1985 and 1986 that she was "pressured" to leave her apartment, and her privacy thereby violated, must also be dismissed on the defendants' motion. Plaintiff left her apartment on September 21, 1934. Amended Complaint ¶ 26(J). Plaintiff's personal involvement in this incident would bely any claim, were she to make it, that knowledge of her cause of action only came about through recent inspection of previously "suppressed" information.

■ Turning now to the Officers' motion to dismiss so much of the complaint as seeks to hold them liable for the alleged withholding of evidence from the jury, court and defense counsel, the complaint does not allege that any of the individual Officers physically destroyed evidence or concealed information from the prosecutor, Wilentz. To the contrary, the complaint in many places alleges that the state police defendants "conspired" with Wilentz to withhold this information. Moreover, police officers are not responsible for deciding what evidence should be provided to defense counsel in a criminal trial, nor are they responsible for deciding what evidence will be presented at trial. These are prosecutorial functions, as recognized by the Supreme Court in *Imbler v. Pachtman, supra*. *See also supra* pp. 364–368. Thus, this aspect of the Officers' motion to dismiss must be granted; the allegation that these defendants withheld evidence from the jury, court and defense counsel fails to state a claim for which relief can be granted.

■ For the same reasons, plaintiff's allegation that the Officers are liable to her for failing to release to her or to the public the physical evidence accumulated in the Hauptmann case must also be dismissed. Plaintiff has not alleged that the state police defendants had or have any control over the release of physical evidence after a criminal prosecution, nor could she; and thus she fails to state a claim for which relief can be granted.

■ Plaintiff alleges generally that the Officers "knowingly ... presented perjured, false and misleading evidence" at trial, Complaint ¶ 26, and, specifically, that defendant Bornmann perjured himself when he testified with respect to the missing floorboard in Hauptmann's attic. *Id.* As noted, the New Jersey State Police are not responsible for deciding what evidence to present at trial. As to the alleged perjury, the claims must be dismissed under *Briscoe v. LaHue, supra*.

■ The remaining allegations arguably applicable to the Officers are that the state police "corruptly encouraged" Joseph Perrone to identify Hauptmann; "threatened" Hans Kloeppenburg in an attempt to prevent him from testifying favorably to Richard Hauptmann; engaged in "jury contamination" by soliciting the views of "prospective jurors"; and "burglarized" the luggage of a defense investigator. The plaintiff, however, does not identify which, if any, of these defendants committed these alleged wrongdoings. From all that appears, the member of the New Jersey State Police thus charged may not even be a defendant in this lawsuit. This is most significant, given the enormous documentary discovery plaintiff has had to date. At its most specific, the complaint alleges merely that defendant Wilentz, "in a conspiracy with all the aforementioned defendants," committed

these acts. The issue is whether these allegations are sufficient to state a cause of action against the individual state police defendants herein under 42 U.S.C. § 1983. As has been noted, *supra* pp. 375–376, plaintiff's allegations of conspiracy are deficient as conclusory and non-specific. Thus, while alleging that she and her husband suffered from "jury contamination," "corrupt encouragement of witnesses," "threatening of witnesses," and "burglarizing of luggage," the plaintiff does not allege which of the Officers engaged in this activity. It is not enough broadly to allege without any facts, as plaintiff has done here, that the state police defendants were all in a conspiracy with defendant Wilentz to engage in the previously described behavior; this too falls victim to the *Rotolo* doctrine. *Supra* pp. 375, 382. Beyond this, the allegation concerning the "burglarizing" of the defense investigator's luggage does not even state the name of the investigator. Accordingly, the motion of the Officers to dismiss plaintiff's complaint insofar as it alleges the foregoing wrongdoings by the New Jersey State Police, either individually or in conspiracy with defendant Wilentz, while not identifying which Officer engaged in the alleged wrongdoing, is granted for failure to state a claim. The issue of the qualified immunity claim of the state police defendants with respect to the aforementioned allegations need not be reached.

■ Finally, plaintiff alleges that defendant Bornmann wiretapped the telephone of a defense investigator and "impartially" searched the personal belongings of a defense investigator, and that defendant Stockburger "clandestinely eavesdropped" upon Richard Hauptmann in jail and overheard conversations between Hauptmann and his attorney. Plaintiff attempts to implicate the remaining Officers by alleging that they conspired with Bornmann and Stockburger to commit these acts. For the reasons stated above, the vague and conclusory "conspiracy" allegation fails to state a claim as to these Officers.

The allegations that Bornmann "impartially" searched the luggage of a defense investigator also fails to satisfy the Third Circuit's requirement of specificity. Plaintiff does not allege the name of the defense investigator or any facts surrounding the incident, such as when, where and why it was done; what, if anything, was uncovered; and what constitutional right of the plaintiff's decedent was violated. Finally, the complaint does not state how, if at all, Richard Hauptmann or the plaintiff was prejudiced by the alleged search. Accordingly, the allegation that Bornmann searched a defense investigator's personal belongings is dismissed for failure to state a claim under 42 U.S.C. § 1983.

For the reasons set forth below, I find that defendants Stockburger and Bornmann are entitled to summary judgment dismissing plaintiff's complaint insofar as it seeks to hold them liable for the alleged "eavesdropping" and "wiretapping."

■ Assuming for the purposes of this portion of the opinion that plaintiff has stated a claim under 42 U.S.C. § 1983 for the alleged "eavesdropping" and "wiretapping," and assuming further that these claims are not barred by the applicable statute of limitations, the conduct of Bornmann and Stockburger must be tested against the qualified immunity enjoyed by police officers in their official conduct. As previously indicated, *supra* pp. 371–372, it was not until 1967 in *Katz v. United States, supra,* that the Supreme Court announced that electronic surveillance constituted a fourth amendment violation. *Cf. Olmstead v. United States, supra* (no fourth amendment violation because no "trespass".) Plaintiff argues that wiretapping was a crime under New Jersey state law. The question under qualified immunity, however, is whether the officer could reasonably have been aware that he was violating a federal constitutional right.

With respect to allegations of "eavesdropping," as noted in connection with defendant Wilentz, *supra* pp. 373–374, it is not clear that plaintiff could even state a claim for such conduct under 42 U.S.C. § 1983 under

current law as distinct from 1930–1935. The Supreme Court has held that prisoners have at most a diminished expectation of privacy. *Bell v. Wolfish, supra,* 441 U.S. at 556–57, 99 S.Ct. at 1883.

Accordingly, because the constitutional law with respect to eavesdropping and wiretapping was not clearly established at the time of the alleged actions, and the defendants Stockburger and Bornmann could not fairly be said to "know" that the law forbade conduct not previously identified as unlawful, the complaint is dismissed.

## V. Statute of Limitations

The defendants have sought dismissal of all claims on statute of limitations grounds. When the wrongful conduct alleged was instantly apparent, on the face of the complaint, for example, the alleged beating of Hauptmann, or the alleged theft of plaintiff's property, we have applied the statute.[44] When, however, a wrongful act is alleged and the plaintiff has contended that defendants' fraudulent concealment tolled the statute, we have not reached the statute of limitations issue on what were, except for the *Harlow* doctrine, applications of Fed.R.Civ.P. 12(b)(6) and the consequent assumption that the averments of the complaint were true.

For guidance of counsel, however, the following is presented as appropriate, given the submissions in the matter.

As we have stated, under 42 U.S.C. § 1983 federal courts must borrow the state law of limitations governing an analogous cause of action. The parties here have agreed that, at least as to the most serious of the claims, the most analogous New Jersey cause of action is that for wrongful death, N.J.S.A. 2A:31–1, which is governed by a 2-year statute of limitations.

Plaintiff's claims arise from events occurring almost 50 years ago. To avoid the statute of limitations bar, plaintiff contends: 1) commencement of the running of the statute of limitations should not be deemed to begin until 1981 when plaintiff first discovered the facts giving rise to her claim; and 2) the running of the statute should be tolled, and defendants should in any case be estopped from invoking it, because defendants fraudulently concealed operative facts from plaintiff.

In § 1983 actions federal courts must apply the state rules for tolling the borrowed statute of limitations unless the state rules are inconsistent with the federal policy underlying § 1983. *Tomanio, supra,* 446 U.S. at 484–86, 100 S.Ct. at 1795–96; *accord Chardon, supra,* —— U.S. at ——, 103 S.Ct. at 2615–19; *Aitchison, supra,* 708 F.2d at 100–03; *Knoll, supra,* 699 F.2d at 140, 142. The question of when a § 1983 action accrues, however, is one of federal law. *See Keating v. Carey,* 706 F.2d 377, 382 (2d Cir.1983); *Sandutch v. Muroski,* 684 F.2d 252, 254 (3d Cir.1982) (per curiam); *Cox v. Stanton,* 529 F.2d 47, 50 (4th Cir. 1975). *But see Clulow v. Oklahoma,* 700 F.2d 1291 (10th Cir.1983). Under federal law, a § 1983 claim accrues, and the limitations period begins to run, when the plaintiff knows or has reason to know of the injury that is the basis of his action. *Barrett v. United States,* 689 F.2d 324, 333 (2d Cir.1982); *Sandutch, supra,* 684 F.2d at 254; *Cox, supra,* 529 F.2d at 50.[45]

---

**44.** A limitations defense may be raised by a Fed.R.Civ.P. 12(b)(6) motion to dismiss so long as the statutory bar is apparent on the face of the complaint. *See Leone v. Aetna Casualty & Surety Co.,* 599 F.2d 566, 567 (3d Cir.1979); *Bethel v. Jendoco Construction Co.,* 570 F.2d 1168, 1174 (3d Cir.1978). Given the nature of these observations, however, it is unnecessary to limit discussion to the complaint.

**45.** For this reason, defendants' reliance on *Presslaff v. Robins,* 168 N.J.Super 543, 403 A.2d 939 (App.Div.1979), may be questioned. In *Presslaff,* the Appellate Division, relying on

*Lawrence v. Bauer Publishing & Printing Ltd.,* 78 N.J. 371, 396 A.2d 569 (1979) (statute of limitations for libel), held that the "discovery rule" does not apply to wrongful death actions. *Presslaff, supra.* Under New Jersey law, the discovery principle applies only to an "accrual" period of limitations, and not, as is the case with wrongful death, to a limitations period based on a "fixed objective event." *Id.*

Plaintiff here, however, brings a § 1983 claim, not a wrongful death action. The discovery rule involves the issue of when a cause of action arises for statute of limitations pur-

■ As to what a plaintiff must know, while not frequently discussed in § 1983 cases, it would seem that plaintiff must be aware of both the fact of injury and its causal connection with defendants' acts, but need not know that a defendant's conduct is tortious or otherwise legally wrong. *See United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (discovery rule under Federal Tort Claims Act); *Lavellee v. Listi,* 611 F.2d 1129, 1131 (5th Cir.1980) (applying *Kubrick* rule to § 1983 claim).[46]

■ Plaintiff also argues that defendants' alleged fraudulent concealment of pertinent facts both tolls the statute of limitations and equitably estops defendants from relying on it. Under New Jersey law, which we borrow, such fraudulent concealment tolls the commencement of the running of the statute until plaintiff discovers the cause of action or discovers facts that reasonably put him on notice of it. *See Foodtown v. Sigma Marketing Systems, Inc.,* 518 F.Supp. 485, 488 (D.N.J.1980); *Osadchy v. Gans,* 436 F.Supp. 677, 681 (D.N.J.1977); *Kohler v. Barnes,* 123 N.J.Super. 69, 79, 301 A.2d 474 (Law Div.1973); *Zimmerman v. Cherivtch,* 5 N.J.Super. 590, 593–94, 68 A.2d 577 (Law Div.1949). This is

consistent with the federal rule. *See Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Keating v. Carey, supra,* 706 F.2d at 382.

■ Two types of so-called "fraudulent concealment" may toll the statute of limitations. In the first, the underlying events being sued upon involve fraud that by its nature is concealed.[47] *See Roberts v. Magnetic Metals Co.,* 611 F.2d 450, 462 (3d Cir. 1979) (Seitz, C.J. dissenting); *Kyle v. Green Acres at Verona Inc.,* 44 N.J. 100, 109, 207 A.2d 513 (1965); *Hyland v. Kirkman,* 157 N.J.Super. 565, 581, 385 A.2d 284 (Ch.Div. 1978). In the second, defendant makes some affirmative, independent effort to conceal the events or circumstances surrounding the underlying cause of action, irrespective of whether those underlying events are inherently fraudulent or not. *See Foodtown v. Sigma Marketing, supra,* 518 F.Supp. at 492–94; *Lopez v. Swyer, supra,* 62 N.J. at 275 n. 2, 300 A.2d 563; *see also Gee v. CBS, Inc.,* 471 F.Supp. 600, 623 (E.D.Pa.) (Becker, J.), *aff'd,* 612 F.2d 572 (3d Cir.1979). In both cases, the statute is tolled until plaintiff discovers, or in the exercise of reasonable diligence should discover, the wrong.[48]

poses; it tempers the rule that accrual occurs at the moment of injury. *See Burd v. New Jersey Bell Telephone Co.,* 76 N.J. 284, 291, 386 A.2d 1310 (1978); *Lopez v. Swyer,* 62 N.J. 267, 272–74, 300 A.2d 563 (1973). Although related to the issue of what tolls the statute of limitations, the question of accrual is analytically distinct—and a matter of federal law. Accordingly, the *Bauer* rule and the *Presslaff* holding do not control.

46. Under New Jersey law, the discovery rule embraces knowledge of fault. *Lynch v. Rubacky,* 85 N.J. 65, 73, 424 A.2d 1169 (1981). Although plaintiff need not discover the full legal significance of the material facts in the case to trigger the statute, plaintiff must be aware of facts relating to the injury and its cause that suggest the guilt of another. *See id.; Tevis v. Tevis,* 79 N.J. 422, 432, 400 A.2d 1189 (1979); *Mant v. Gillespie,* 189 N.J.Super. 368, 372–73, 460 A.2d 172 (App.Div.1983).

Although not directly pertinent to the issue of accrual, New Jersey law is relevant to the issue next discussed in the text: tolling due to fraudulent concealment.

47. Although frequently placed under the heading of "fraudulent concealment," this situation is best understood as involving fraudulent behavior that tolls the limitations period but not as fraudulent concealment. True fraudulent concealment applies to any cause of action. The present doctrine applies when the "gist of the action" itself is fraud and the concealment is inherent in the fraud. *See Holmberg v. Armbrecht, supra.* Clearly, there is significant overlap between this doctrine of "inherent fraud," and the question of accrual of a cause of action. Plaintiff here can be taken to assert that the "gist" of her claim is "fraud": fraudulent prosecution.

48. The Seventh Circuit, as a matter of federal law, has adopted the rule that the due diligence standard does not apply to cases of "affirmative" fraudulent concealment. In such cases, the statute is tolled until actual discovery by plaintiff. *See Tomera v. Galt,* 511 F.2d 504 (1975); *Sperry v. Barggren,* 523 F.2d 708 (7th Cir.1975). This rule has not been widely followed; most courts impose a requirement of due diligence for both types of fraudulent

It is also to be borne in mind that averments of fraudulent concealment must meet the particularity of pleading requirement of Fed.R.Civ.P. 9(b).

We are skeptical of plaintiff's arguments under any of these theories of accrual or tolling. Many of the claims plaintiff now makes were previously known and made. Others appear reasonably knowable. Thus, during summation at trial Hauptmann's defense attorney charged the police with fabricating evidence, in particular, the kidnap ladder, the closet molding with Condon's phone number written on it, and the chisel allegedly used to make the ladder. On appeal, Hauptmann claimed there was a determined effort to hide exculpatory evidence from the defense. In his habeas corpus petition, Hauptmann alleged that the prosecution suppressed letters from Fisch to Hauptmann, and that the state failed to disclose that the kidnap ladder had been altered. Thus, as early as 1935–36 there were allegations that the trial was fraudulently conducted.

Further, in 1976 Anthony Scaduto published *Scapegoat,* a well-known book highly critical of the prosecution in the Hauptmann case. This book, based in part on evidence maintained by the New Jersey State Police, advances many of the claims plaintiff presents here. Although aware of this book, having spoken with Mr. Scaduto and having been sent a copy by him, plaintiff read only one-third of it, putting it aside as "upsetting" and "nothing really new." Anna Hauptmann Aff. ¶ 12.[49] This

is not an exercise of reasonable diligence. *Cf. O'Brien v. Eli Lilly & Co.,* 668 F.2d 704, 710 (3d Cir.1982) (*Newsweek* article).

Plaintiff indicates that, despite conversations with Scaduto, she "still had no idea that the State of New Jersey or the FBI of all places contained material which would help prove my husband's innocence." Hauptmann Aff. ¶ 12. Further, she indicates that, if she had known evidence was being concealed, she would have tried to get it. *Id.* Yet, despite Scaduto's charges and plaintiff's long-standing convictions, plaintiff herself made no effort to gain access to the FBI files via the Freedom of Information Act, 5 U.S.C. § 552, or, until 1981, to seek access to the New Jersey State Police records under the applicable state law, *see* N.J.S.A. 47:1A–1 *et seq.*

Equally important, plaintiff's affidavit betrays a misconception of what plaintiff must know for purposes of causing the running of the statute of limitations to commence. The statute of limitations is triggered by plaintiff's awareness of facts giving rise to the cause of action and not by awareness that the illegality of the defendants' action is conclusively provable. *See Lewis v. Clark,* 534 F.Supp. 714, 716–17 (D.Md.1982). Much of plaintiff's affidavit simply reveals that plaintiff was unaware of facts that would permit her to prevail in her case; this is insufficient to postpone the running of the statute.

Plaintiff, of course, did gain access to the New Jersey State Police files in 1981, and

---

concealment. *See, e.g., Campbell v. Upjohn,* 676 F.2d 1122, 1128 (6th Cir.1982); *State of Ohio v. Petrson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 294–95 (10th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1170 n. 27 (5th Cir.1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980).

New Jersey has not expressly addressed this particular issue. We believe, although we do not actually decide, that New Jersey would join those courts declining to formulate a separate rule for cases involving active concealment. As the Sixth Circuit observed, the important public policies behind statutes of limitations are not best served if

the statute [is] tolled indefinitely, while evidence stales, memories fade and courts and adversaries wait, until the plaintiff at his leisure alleges actual discovery, despite the avalanche of evidence that would put all but the most indiligent plaintiffs on notice of a cause of action.

*Campbell v. Upjohn, supra,* 676 F.2d at 1128.

Given the posture of the present motion, however, it is unnecessary to resolve all of the subtleties associated with the various theories of accrual and tolling. *See generally* Marcus, *Fraudulent Concealment in Federal Court: Toward a More Disparate Standard,* 71 Geo.L.J. 829 (1983).

**49.** Reference is to the affidavit of Anna Hauptmann, filed January 31, 1983.

much is made of this. Plaintiff, however, filed both her initial complaint, running some 55 pages, and first amended complaint prior to reviewing these records.[50] This obviously vitiates the claim that access to these files was necessary for plaintiff to be aware of the facts giving rise to her cause of action.

It is no doubt true that plaintiff had a more detailed view of the alleged fraudulent prosecution after reviewing the state police (and FBI) files than before. For statute of limitations purposes, however, a plaintiff does not need to be aware of the full extent of a conspiracy, or fraudulent scheme, or of all the details that would be necessary to establish that one existed. *See Sandutch v. Muroski, supra,* 684 F.2d at 254; *Osadchy v. Gans, supra,* 436 F.Supp. at 684. The statute of limitations begins to run when plaintiff is aware of facts that put her on notice of the conspiracy or general fraudulent scheme. *See Sandutch, supra,* 684 F.2d at 254; *Osadchy, supra,* 436 F.Supp. at 681. This court is persuaded that plaintiff was aware of such facts long before 1981. Thus, plaintiff's attempts to avoid the statute of limitations on postponement of accrual or "inherent fraud" grounds are, at present, unconvincing.

Also unpersuasive at this juncture is plaintiff's claim of "active" fraudulent concealment. The state's preservation of the evidence and the voluminous documentary record in this case for over 45 years is an eloquent refutation of such a claim. Indeed, the state has retained the very physical evidence that plaintiff alleges was fabricated, hardly reflective of concealment or a "cover-up" of an alleged fraudulent prosecution.

It is also noted that plaintiff never made application for access to the police records (or the FBI records) until 1981. It is nothing more than sheer conjecture to suggest that had such an application been made

earlier it would have been denied. All we know is that when an application was made and the appropriate legal steps taken— steps that were available well before 1981— the records were made public. Thus, it cannot be reasonably concluded that defendants actively misled plaintiff as to the existence of a cause of action.

Plaintiff maintains that defendants' silence as to the alleged fraudulent nature of the prosecution, and their protestations of no wrongdoing, misled her as to the existence of a claim. Absent a fiduciary relationship, however, neither a mere denial of wrongdoing nor a failure to disclose the existence of a cause of action amounts to affirmative concealment. *See Campbell v. Upjohn,* 498 F.Supp. 722, 728 (W.D.Mich.1980) (citing cases), *aff'd,* 676 F.2d 1122 (6th Cir.1982).

Thus, plaintiff at this juncture, with all of the materials unveiled, has failed to sustain the burden of showing active misleading by defendant.

As already noted, with the exceptions mentioned, we do not now decide the statute of limitations issue. The foregoing observations, however, may aid counsel in the assessment of the case overall.

### VI. Motion to Dismiss Complaint Insofar As It Seeks to Overturn Richard Hauptmann's Conviction

Plaintiff seeks a declaratory judgment that Richard Hauptmann's conviction is void because of alleged violations of his constitutional rights by the State of New Jersey. She asks this court to set aside her husband's conviction and declare that he is not guilty of the kidnapping and death of Charles Lindbergh, Jr.

The motion of the State of New Jersey to dismiss the complaint for failure to state a claim insofar as it seeks to overturn Hauptmann's conviction or to obtain a declaration of his innocence is granted.

---

**50.** Executive Order # 110, issued October 9, 1981, granted the public access to the state police records and evidence in the Lindbergh case. Actual inspection was first permitted on November 23, 1981. Plaintiff filed her complaint on October 14, 1981, and her first amended complaint on November 23, 1981.

■ There are three ways in which an individual can collaterally attack a criminal conviction. The most familiar is the petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254. A second approach is a petition for a writ of error *coram nobis. See* 28 U.S.C. § 1651. Finally, an individual may proceed under 42 U.S.C. § 1983 to obtain a declaratory judgment that a conviction is invalid because of constitutional violations. None of these remedies is available to plaintiff here.[51]

### 42 U.S.C. § 1983

There is a split of authority among the circuits as to whether 42 U.S.C. § 1983 can be employed in collaterally attacking a state court criminal conviction. *Compare Cavett v. Ellis,* 578 F.2d 567 (5th Cir.1978) *with Shipp v. Todd,* 568 F.2d 133 (9th Cir. 1978) (per curiam). Having considered the various viewpoints, and lacking any express guidance from the Third Circuit, I adopt the view that 42 U.S.C. § 1983 cannot be used to attack a conviction collaterally.

In *Cavett v. Ellis, supra,* plaintiff, pursuant to 42 U.S.C. § 1983, attacked the validity of five state court convictions. He argued that each had been obtained in violation of his right to counsel and in the absence of effective assistance of counsel. He sought both a declaratory judgment and an order expunging all records of the conviction. The district court dismissed the action for failure to state a claim.

> The court of appeals affirmed, stating:
>
> Stripped to the bone, the plaintiff's action under § 1983 is little more than a habeas corpus action without a custody requirement. We do not believe that § 1983 was meant to be a substitute for habeas corpus when there is no custody. Under 28 U.S.C. § 2254, we have authority to grant habeas corpus relief to persons in custody pursuant to judgment of state courts. This is the Great Writ, and we endeavor to make it available to those suffering under unconstitutional imprisonment. We have, however, refused to

extend habeas corpus relief to those not in custody. Under his theory of § 1983, the appellant would have us sit in perpetual review of all criminal convictions. We will not make the appellant's § 1983 action the greater writ by avoiding the custody requirement directly.

*Cavett v. Ellis, supra,* 578 F.2d at 569 (footnote omitted); *cf. Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1972) (§ 1983 not a substitute for habeas corpus when there is custody).

Similarly, in *Hanson v. Circuit Court of First Judicial Circuit,* 591 F.2d 404 (7th Cir.), *cert. denied,* 444 U.S. 907, 100 S.Ct. 220, 62 L.Ed.2d 143 (1979), plaintiff challenged an Illinois state court conviction that resulted in a fine-only sentence. The court held that 42 U.S.C. § 1983 was not available to attack the constitutionality of a state court conviction. The court wrote:

> [W]e think that Congress intended that habeas corpus provide not only the exclusive federal remedy for those in custody, but also the exclusive federal remedy for all who seek to attack state court judgments of convictions.

*Id.* at 410; *see also Delaney v. Giarrusso,* 633 F.2d 1126, 1128 (5th Cir.1981) (per curiam).

This court agrees with the views stated in the cases cited above. Federal post-trial intervention designed to annul the results of a state trial is a drastic step and implicates important principles of federalism, comity and equity that govern the exercise of the power of the federal courts. *See Hanson, supra,* 591 F.2d at 410–11 (citing *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975)). To foster these principles, the Supreme Court has recently ruled that a habeas petitioner must present all of his constitutional claims to the highest state court before invoking federal court jurisdiction. *See Rose v. Lundy,* 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982). To hold that 42 U.S.C. § 1983 may be used to attack a state court

---

**51.** At oral argument plaintiff's counsel did not strongly press this aspect of her complaint.

Nonetheless, a brief analysis of the issue is appropriate.

conviction would dilute the principle underlying the "exhaustion" requirement and would imprudently intrude into state court processes. As the Fifth Circuit has written:

> [W]e believe the arguments against the use of § 1983 for the purposes of impeaching a completed state criminal conviction far outweigh the possible salutory [sic] benefits of such an action. First, we are concerned about finality. The convictions complained of occurred years ago.... It is certainly possible, if not probable, that during the years, records of past proceedings become lost or destroyed and witnesses become missing or dead. Given this possibility, even a properly convicted felon could wait out the records of a case and then bring his action....

*Cavett, supra,* 578 F.2d at 570; *see also Siano v. Justices of Massachusetts, supra.*

### Writ of Error Coram Nobis

 An application for a writ of error *coram nobis* is another procedure for collaterally attacking a conviction. *See United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1953); *United States v. Steese,* 144 F.2d 439 (3d Cir.1944); *In re Alger Hiss,* 542 F.Supp. 973 (S.D.N.Y.1982). As explained in *United States v. Morgan, supra,* 346 U.S. at 505 n. 4, 74 S.Ct. at 249 n. 4, the application for a writ of error *coram nobis* "is a step in a criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil proceeding." Thus, an essential aspect of the remedy is that it is available only from the court that entered the judgment of conviction in the first instance. *See generally* 7 Moore's Federal Practice ¶ 60.14 (2d ed. 1982).

The judgment against plaintiff's husband was entered in 1935 by the Court of Oyer and Terminer, Hunterdon County, New Jersey. Any relief that plaintiff seeks by way of a writ of error *coram nobis* must be directed at the state level. The requested relief of declaratory judgment overturning her husband's conviction, insofar as it purports to rely on this procedure, is denied.

### Habeas Corpus

 Finally, plaintiff cannot invoke the habeas corpus jurisdiction of this court to set aside her husband's conviction. Section 2254(a) of Title 28 of the United States Code requires that a petitioner must be "in custody" in order for a writ of habeas corpus to be issued. The Supreme Court has ruled that severe restraints on personal liberty satisfy the custody requirement. *See, e.g., Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968).

 Numerous courts have ruled, however, that a federal court does not have jurisdiction to consider a petition for a writ of habeas corpus following the death of the petitioner. *See, e.g., Knapp v. Baker,* 509 F.2d 922 (5th Cir.1975) (per curiam); *United States v. Fay,* 284 F.2d 301 (2d Cir.1960); *Hann v. Hawk,* 205 F.2d 839 (8th Cir.1953); *In re Kravitz,* 504 F.Supp. 43, 52 (M.D.Pa. 1980). Accordingly, assuming that plaintiff otherwise has the legal capacity to assert the unconstitutionality of her husband's conviction, I conclude that petitioner does not satisfy the custody requirement of 28 U.S.C. § 2254(a) and that this court does not have jurisdiction over a habeas corpus proceeding.

The portion of the complaint seeking a declaratory judgment that plaintiff's husband was not guilty of the crime for which he was convicted, and overturning the conviction entered against him, is dismissed for failure to state a claim.

### VII. Claims Against Brendan T. Byrne, James R. Zazzali, Clinton L. Pagano, Thomas Kean, and Irwin Kimmelman

Also named as defendants, at the time this suit was instituted, were Brendan T. Byrne, then Governor of New Jersey; James R. Zazzali, then Attorney General of New Jersey; and Clinton L. Pagano, then Superintendent of the New Jersey State Police. Each was sued individually and in his official capacity. Defendants Byrne and Zazzali have since left office; insofar as they were sued in their official capaci-

ties, their successors, Governor Thomas Kean and Attorney General Irwin Kimmelman, have been automatically substituted as defendants Fed.R.Civ.P. 25(d)(1). The discussion of the claims against Byrne and Zazzali, below, applies with equal force to the claims against Kean and Kimmelman.

In her Amended Complaint, plaintiff alleges that Byrne, Zazzali and Pagano are the custodians of records concerning the investigation, prosecution, and execution of Hauptmann. She accuses them of concealing certain evidence and permitting other evidence to be removed from their possession and lost, and asserts that their actions violated her first and fourteenth amendment rights. Amended Complaint ¶¶ 7, 13–15, 33, 58. She seeks damages and a preliminary and permanent injunction directing the United States Marshal to seize all records relating to the Hauptmann case and instructing Byrne, Zazzali and Pagano to cooperate by providing the records sought.

■ On October 9, 1981, then-Governor Byrne issued an executive order which released all available Hauptmann records to the public and directed Colonel Pagano to establish procedures to ensure that the inspection would be orderly and would not damage the records. Exec. Order No. 110 (Oct. 9, 1981). Inasmuch as the object of the preliminary and permanent injunction sought by plaintiff was to keep the Hauptmann records secure "until such time as further Court orders permit access and review under appropriate circumstances by counsel and other designated representatives of Mrs. Anna Hauptmann, Plaintiff[,]" Amended Complaint, Prayer for Relief, ¶ 1, plaintiff has already received the equitable relief she sought, and her claim for such relief must be dismissed as moot.

■ Plaintiff's claim for damages based on alleged concealment and loss of evidence must also be dismissed. Plaintiff has failed to plead this claim with sufficient specificity. Although she alleges that Byrne, Zazzali and Pagano violated her first and fourteenth amendment rights, she does not state how she was injured. It is not clear, from the face of the complaint, that the first amendment is implicated at all. Presumably, although this is not stated, plaintiff intends to invoke the due process clause of the fourteenth amendment; she has not alleged facts, however, to show that Byrne, Zazzali or Pagano deprived her of a liberty or property interest. It is not even clear whether plaintiff's claim for damages is based on an alleged violation of her own first and fourteenth amendment rights, or whether it is a derivative claim, based on an alleged violation of her husband's rights. This claim must be dismissed for failure to comply with *City of Philadelphia, supra, Rotolo, supra,* and other Third Circuit cases requiring specificity of pleading in civil rights cases. *See supra* pp. 375, 382.

In summary, all claims against defendants Byrne, Zazzali, Pagano, Kean and Kimmelman must be dismissed. Plaintiff's claim for equitable relief is dismissed with prejudice; her claim for damages is dismissed without prejudice.

## CONCLUSION

Counsel are to confer within 10 days hereof on a form of order. If unable to agree, counsel are directed to appear before the court on September 12, 1983, at 9 a.m. so the form of order can be settled.